MISSOURI PACIFIC RAILROAD COMPANY *v.* SKIPPER.

Opinion delivered October 10, 1927.

1.  MASTER AND SERVANT—"SPOTTING CAR" DEFINED.—"Spotting a car," in language of railroad workmen, means placing it either to be loaded or unloaded.

2.  MASTER AND SERVANT—NEGLIGENCE UNDER FEDERAL EMPLOYERS' LIABILITY ACT.—The Federal Employers' Liability Act does not define negligence, and in actions thereunder the question of negligence is to be determined according to the common law and the rulings prevailing in the Federal courts as to what constitutes negligence under the common law.

3.  NEGLIGENCE—DISCOVERED PERIL.—The doctrine of discovered peril means that when one person sees another in a place of danger or peril he must exercise ordinary care to avoid injuring him. and is liable if he fails to do so.

4. MASTER AND SERVANT — DISCOVERED PERIL UNDER FEDERAL EMPLOYERS' LIABILITY ACT.—The doctrine of discovered peril applies to actions under the Federal Employers' Liability Act, which provides for recovery for injury or death resulting in the whole or part from the negligence of officers, agents, or employees of a carrier.

5. COMMERCE—RECOVERY FOR WRONGFUL DEATH—APPLICATION OF STATE STATUTES.—In actions under the Federal Employers' Liability Act, the carrier must be engaged in interstate commerce and the injured employee must be employed by such carrier in such commerce, and, when injury so occurs, State statutes relating to recovery for death by wrongful act, neglect or default have no application.

6. MASTER AND SERVANT—DISCOVERED PERIL—SUFFICIENCY OF EVIDENCE.—In an action under the Federal Employers' Liability Act for the death of a freight conductor, evidence of a railroad employee's negligence after discovering the peril of deceased, who was struck by a car being switched, *held* sufficient to go to the jury.

7. MASTER AND SERVANT—FEDERAL EMPLOYERS' LIABILITY ACT—LOOK-OUT STATUTE.—In an action for the wrongful death of an employee under the Federal Employers' Liability Act, the State lookout statute (Crawford & Moses' Dig., § 8568), has no application.

8. MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE—JURY QUESTION.—In an action under the Federal Employers' Liability Act for the death of a freight conductor, conflicting evidence as to whether he directed the railroad employees as to the manner of switching the car which struck him, *held* to present a question for the jury.

9. MASTER AND SERVANT—EMPLOYERS' LIABILITY ACT—INSTRUCTION AS TO ASSUMED RISK.—In an action under the Federal Employers' Liability Act for the death of a freight conductor, struck by a car being switched, an instruction as to assumed risk *held* not improper.

10. NEGLIGENCE—REDUCTION OF DAMAGES FOR CONTRIBUTORY NEGLIGENCE.—In an action for death under the Federal Employers' Liability Act, an instruction that, if deceased was guilty of negligence, the jury should diminish the damages accordingly, was proper.

11. MASTER AND SERVANT—DEATH OF EMPLOYEE—NEGLIGENCE IN OPENING SWITCH.—In an action under the Federal Employers' Liability Act for the death of a freight conductor, struck by a switched car, the alleged lack of congressional law providing for giving warning is of no importance, where the action was based on the negligence of the defendant employee in opening a switch

and letting the car run toward deceased, who had his back turned to the switch, after discovering deceased's peril.

12. MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE—JURY QUESTION.—In an action under the Federal Employers' Liability Act for the death of a freight conductor struck by a car being switched, while he was standing with his back toward the switch from which the car was striking him came, *held* to present a jury question.

Appeal from Lonoke Circuit Court; *George W. Clark,* Judge; affirmed.

*Harvey G. Combs* and *Thomas B. Pryor,* for appellant.

*Pace & Davis,* for appellee.

MEHAFFY, J. Mrs. Fannie Skipper, administratrix of the estate of W. A. Skipper, deceased, began this action against the Missouri Pacific Railroad Company, a corporation, to recover damages for the injury and death of W. A. Skipper, and the suit is for the benefit of the widow and children of deceased.

The plaintiff alleged, in substance, that she is a resident and citizen of North Little Rock, Arkansas, and that she is the duly qualified and acting administratrix of the estate of W. A. Skipper, deceased, having been appointed such administratrix by the probate court of Pulaski County, Arkansas. That the defendant, Missouri Pacific Railroad Company, is a corporation organized under and by virtue of the laws of the State of Missouri, and is engaged in operating a line of railroad, transporting passengers and freight for hire, in the states of Missouri, Arkansas, Louisiana, and other states in the United States.

She alleges that the suit is for damages for personal injuries sustained by W. A. Skipper on the 14th day of January, 1926, that resulted in his death, the said W. A. Skipper being in the employ of the defendant, Missouri Pacific Railroad Company, at the time in the capacity of a conductor operating a freight train, and that this suit is brought under the Federal Employers' Liability Act. That, at the time said injury occurred, W. A. Skipper was engaged in interstate commerce, and

that the cars that were being handled and other cars in the train were carrying interstate commerce, carrying freight to the State of Louisiana from points without the State of Louisiana, and also carrying freight passing through the State of Louisiana that originated in a State outside of Louisiana. Plaintiff alleges that deceased was in the employ of the company in the capacity of a conductor, and at work in the assisting of running a freight train from Collinston, Louisiana, to Ferriday, Louisiana, and that, while on the house-track at Ray-ville, Louisiana, engaged at work upon a coupling on a car standing on said track, in front of the freight depot, a car was kicked in upon him without warning, and caught him between the platform and the car, and crushed him in such a manner that, after living about thirty-six hours, he died. That the injuries were caused by the negligence and carelessness of the defendant. That, while deceased was trying to adjust a coupler on the end of a car standing on the house-track in front of the freight depot, with his back toward the switch, W. J. Rogers, one of the brakemen upon the train, carelessly, negligently and recklessly, and after discovering the peril of the deceased, and without warning to the deceased, threw the switch and ran a freight car in and onto said house-track and upon and against the deceased, thereby injuring him, resulting in his death. That deceased was a strong, robust and healthy man, 45 years of age, and was earning $3,600 a year, all of which, except his personal expenses, he contributed to the support of his family; that there are now surviving him his widow and three children, his sole heirs at law and next of kin, and that the widow and children were dependent upon him for support, and con-stituted his family, to whom he contributed the amount aforesaid for support and maintenance; and that, from the time the said W. A. Skipper received the injuries aforesaid until the time of his death, a period of about thirty-six hours, he was conscious, and suffered great and excruciating pain of body and anguish of mind, which said injuries were caused through the negligence and carelessness of the defendant aforesaid.

The answer of the defendant was a specific denial of each allegation of the complaint, with a plea of assumed risk and contributory negligence.

The trial resulted in a verdict and judgment for $20,000, from which is this appeal.

The appellant's first contention is that the court erred in not directing a verdict for the defendant, and, in this connection, argues that instruction No. 1, requested by the plaintiff, should not have been given, because it contends that the evidence was not sufficient to warrant the court in submitting such an issue to the jury.

Instruction No. 1, complained about, reads as follows:

"The court instructs the jury that plaintiff relies for a recovery in this case alone upon the doctrine of discovered peril, and, if you find from a preponderance of the evidence that the deceased, W. A. Skipper, was in the employ of the defendant, Missouri Pacific Railroad Company, as a conductor on a freight train, and, before the injury, in a place of peril on or near the house-track of the defendant, at the freight depot in the town of Rayville, Louisiana, and that W. J. Rogers was a brakeman on said train and in the employ of the defendant, and that the said W. J. Rogers, after discovering the peril of the deceased, W. A. Skipper, failed to exercise ordinary care and diligence in the use of the means at his command to avoid injuring the deceased, but carelessly and negligently threw the switch and turned a freight-car onto the house-track, after he knew of the peril of the deceased, without any warning to the deceased, and that deceased was struck and injured by said car, and, as a result of said injuries, the deceased thereafter died, and that the act of the brakeman in turning the car onto the house-track, after discovering the peril of the deceased (if you find these facts to be true from a preponderance of the evidence), was the proximate cause of the injury, and that the deceased was not guilty of contributory negligence and had not assumed the risk, then you will find for the plaintiff, and assess such damages as you may find should be awarded under

the evidence and other instructions given in the case.''

The facts are substantially as follows: A plat or blue-print was introduced, showing the location of the freight depot, the public road, the road that runs back of the depot, the house-track, the main line, and where the caboose was left. Also the switch which was thrown and the place where the truck was standing.

The deceased, W. A. Skipper, was 45 years old at the time of his death, and he and the plaintiff had been married 21 years. She lived in North Little Rock, and was appointed by the probate court of Pulaski County as administratrix of the estate of W. A. Skipper, the deceased. There were three children born of their marriage, Lucile, Walter Jr., and Charles, the last two being 12 and 8 years, respectively. That, when the plaintiff, after receiving a telephone message, reached Monroe, Louisiana, at 10:15 at night, she found her husband in a sanitarium, very sick. He told her that he had suffered bodily and mentally since morning. He was hurt in the chest. She stayed in the hospital all the time. During the next day he was partly conscious, and unconscious during the afternoon and night. After one o'clock he asked what time it was, and he said that he thought it was seven o'clock. He would seem to be conscious for a few minutes, and then he would go right off. During the last few minutes of his life he was very restless. He was a very large man, and the girl said he was suffering so that nothing she would give him would ease him. He was practically delirious all that night. He died at 9:20 Friday night. When witness got to Monroe, deceased asked her about the children. His salary varied, but he worked steadily. His salary was usually around $350 a month, but during busy seasons it was a good deal more than that. He was not an extravagant man. All the money he used was what it took to live on, and the rest of it was used at home. He would come home every Sunday, but he could not stay long on account of the way the trains ran. He did not drink or gamble, and had no wasteful habits, and lived an economical, frugal life. His personal expenses were between

fifty and sixty dollars per month, and the rest of it was used on the family.

Gus Roberts testified that he was 20 years old; lived in Rayville, Louisiana, and was at work on the 14th day of January, the morning that Mr. Skipper was injured; was delivering a truck for Mr. Fortenberry, for whom he worked. Was with Edwin Pea on the truck, and was at the depot at the time Mr. Skipper got hurt. Was at the railroad crossing at the time of the accident, at the place where the public road crosses the railroad track. Was waiting for the train to get from over the crossing. Was five or six feet from the switch at the road crossing where the brakeman was doing the switching. Saw Mr. Skipper before the accident. There was a car on the switch, and he passed this car, and happened to notice that there was something wrong with the knuckle, and he straightened it, and when this car came in there they coupled together, and they pulled the train on up above the crossing to the switch, and he was in there, and had his back to the switch. They kicked the car in on him. Witness said he was 40 or 50 yards from there, in plain view of him, right near Rogers, who threw the switch and turned the car in on the house-track. "There was nothing between Skipper and me to keep me from seeing him plainly. There was not anything between Rogers and Skipper. It was plain and open." Witness ran down to where Skipper was injured, and Skipper told him to get him where he could lie down. He seemed to be suffering. Rogers could see Skipper, and did see him before he turned the car in on him. They pulled the car up above and gave it a swift kick, and the south end of the switch was kind o' down grade. When the car got there, it picked up and went faster. He thinks there were two cars standing on the house-track. The car was kicked with so much force that two stationary cars went on down beyond the freight-house and depot platform. He saw where the cars were knocked at that time. Witness then explained the map or blue-print. Mr. Skipper had his back turned to the brakeman and from the

direction where the switch was the car was thrown in on him, and he remained there until it hit him. He was fixing a knuckle, and later, about the time the car struck him, he looked back, and fell in between the platform and the track as it struck. He saw the darkey standing up there looking at him, and did not holler because he thought they knew what they were doing. It was a white man that threw the switch. Witness cannot read nor write, and has never attended school. Was at the public crossing, sitting on the truck. He knew what deceased was doing. The brakeman was standing at the switch, and witness saw him throw the switch. Brakeman could see Skipper down there where he was at the car. Saw the brakeman looking towards Skipper.

Edwin Pea, another witness for the plaintiff, testified that he lived at Baskin, Louisiana; was working at Rayville, Louisiana, working for Mr. Fortner, and was with Gus Roberts, who was driving a truck. He saw Skipper about the time the car hit him. He was about 50 yards of the depot. While witness and Gus Roberts were up there, the train pulled past the crossing and kicked the car up on the sidetrack. Skipper was standing at the end of the car, with his back turned to witness. There were some more cars standing back towards the platform, and Skipper apparently looked back about the time it hit him. A white brakeman threw the switch. He was about 55 or 56 steps from deceased. The car was coming pretty fast when it passed the switch, and the car was coming at a rapid speed when it came in on the track between where the switch was and the end of the platform. There was nothing between the man at the switch and Skipper. It was just open. There was nothing to have kept him from seeing it. The switch was between witness and Mr. Skipper. Deceased, when they got there, said: ''Boys, take me somewhere where I can lie down; don't let me suffer like this.'' They carried him into the depot office. Witness was on a truck with Gus Roberts. He was in a position where he could see. It was about 150 feet from where witness was to

where Skipper was, and the brakeman was up there at the switch. Brakeman threw the switch before the car reached the switch point. After he threw the switch he had no control of the car. When witness first saw Mr. Skipper he was on the track, with his back in the direction of the switch, and he saw him look around, and he was trying to get out of there and got caught.

R. O. Benton, another witness, testified that he lived at Lonoke, and made some measurements. It is 162 feet from the switch-stand to the corner of the platform at the depot—the freight depot. The platform is 68 feet long. From main track to the switch is 8 feet between the two tracks. From the switch down to the corner of the platform is 162 feet. There is nothing between the switch and the corner of the platform. The house-track is not on the level. It is a natural incline right down that way.

Jack Wright, another witness, testified that he lived at Lonoke, and went with O. Benton, looked over the place where Mr. Skipper was killed, and took some measurements, and testified in substance the same as Benton.

Dave Holman testified that he lived at Dermott, but was working in Louisiana for Mr. Parnell. He knew Skipper, and was on the train the day that he got killed. Skipper gave the orders to the trainmen to spot the car in there. Rogers threw the switch, and they kicked the car down. Skipper was fooling with a knuckle, and witness hollered at him to look out. He jumped to get around the corner of the platform. Witness helped to carry him in. When this witness was asked if he remembered what Mr. Skipper said to those people, if anything, about setting that car in there, he answered, "He told them to spot that car at the freight-house, so it could be **unloaded.**" He had seen cars carried in with the engine many times. That is what they mean by spotting a car. Had seen them carry cars in and spot them before. He testified that they left the caboose on the main line. Then they kicked this car in there, and then went back on the

main line after that, and picked up the caboose. Rogers was looking down there in that direction. He was looking at witness and Skipper.

The following agreement or stipulation was signed by attorneys and introduced in evidence:

"It is agreed between attorneys for plaintiff and attorneys for defendant that W. A. Skipper was the conductor upon the train that was running between Ferriday and Collinston, Louisiana, on the 14th day of January, 1926; that it was a freight train, and reached Rayville, Louisiana, around 8:30 o'clock on the morning of said day; that in said train were cars that were carrying interstate freight, being freight that had originated in St. Louis, Missouri, and consigned to merchants in various towns in Louisiana; that, when they reached Rayville, it became necessary to set one of the cars in on the house-track in order that some freight in that car might be unloaded at Rayville; that this car was an interstate car, containing merchandise that was being shipped from St. Louis, Missouri, to merchants at Rayville, Louisiana; that it was the purpose of the crew to unload the freight from this car that was consigned to Rayville and to put the car back in the train to continue the trip; that this car was the one that injured Mr. Skipper.

"And it is further agreed that this statement may be used in evidence in the case and made a part of the record of the case."

Mortality tables were introduced, showing deceased's expectancy to be 24.5 years.

Defendant introduced Jay Tower, an engineer, who testified about knowing the deceased, when they arrived at Rayville, the cutting off of the caboose, and then said they were going to put one car on the house-track, shove back to the main line, and put another car on the house-track, pull up over the switch, kick one car back, then pull out back to the main line. This was the usual and ordinary movement. Had been doing this every day, and are still doing it this way. You couldn't go in

every time you go to spot a car. He said when they had more cars to go they kick what car they want in there, and when they go back at the last they spot the cars at the house. That is the time they go down with the engine and spot them, after they get all the cars in that belong in there. This witness testified also that deceased said it was his own fault, and he further testified that Skipper told the boys to put this car to the house. Further testifying, witness said: ''If we had been going to put only one car in there we would have gone down with the train and spotted it. By spotting a car, we mean—well, say there is a platform, and we are going to work a car of merchandise into the freight-house. A man that is standing there gives you a signal to back up like this. When the car gets even with that door, he will flag you down. That spots it. You uncouple, go on off, and leave. In other words, that is placing the car by the platform so it can be unloaded. When you spot a car you hold to it until you get it to the place where you want to leave it. Then you uncouple from it and go away. There was another car to be spotted in there, a car we had in the train.''

Rogers, the brakeman, testified that Skipper told him to cut off the caboose and cut the air out ahead of the A. R. T. car, kick it in on the house and shove four cars to the main line back to the caboose, and that deceased said, ''Put the fifth car on the house, and you will work the merchandise while the boys up the train in the clear for the passenger train.'' He testified that this switching movement was made every day. That it was about 8:40 in the morning, and a clear day.

G. F. Newton, another witness and an employee of the railroad company, testified that they stopped there, and cut the caboose off on the main line, took the train up, kicked one car to the house-track. That he cut the car that was kicked in there. He also said that this switching movement, kicking this car onto the house-track, was an ordinary and usual movement of the train at that place. That they had done it quite often while Mr. Skipper was conductor. That they would go in for

a week at a time, making the same movement. That deceased told him to put this car on the house-track.

Jerry Hogg, the brakeman in the employ of the Missouri Pacific, testified that, if the merchandise of Rayville and Collinston were not together, you could not spot but two cars at a time. That they had to make the switch and spot them so that they could go in and do their switching and leave the hind man to do the working of the freight. He also testified about what Mr. Skipper said about his injury, stating that Skipper said the car caught him before he could get out of the way. That the movement of the car at this time was like it had been made ever since he had been on that run. Testified further that they generally do it all the time; the car is kicked in without an engine. That they certainly put in two cars that day and took two out. They did not kick but one car in, shoved the other in.

Chatterton, an agent of the railroad company, testified that he is familiar with the usual movements of the switching cars to the house-track. That they ordinarily set the merchandise cars out there, and the rear brakeman and witness' porter or yard clerk helps work the merchandise while the head brakeman takes the balance of them on down in the yards and does the switching. That they practically always kick the cars in there when there is more than one car. That his record shows two cars. That one of these cars that were in there was cut out with the train. Does not know how far the car went after it was kicked, whether below the depot or not, but it went past the office door. That the platform only accommodated two cars.

A physician then testified as to the injury and suffering of deceased, and other witnesses testified in rebuttal as to the place where the injury occurred, and that the deceased was out in the open where he could be easily seen.

As we have said, the appellant's first contention is that the evidence was insufficient to support the verdict, and that plaintiff's first instruction, heretofore set out, should not have been given.

The undisputed proof is that deceased was standing down by a car in plain view of the switch, and that the switchman who threw the switch and let the car that injured and killed Skipper in on the house-track, was looking towards Skipper, and that there was nothing to prevent his seeing him. The undisputed proof also is that Skipper gave them some directions about putting a car or cars in there. Some of appellant's witnesses testify that there were two cars, other witnesses testify that there was only one, and that the deceased, who was the conductor, directed them to spot the car, and, when that was done, some of them would unload the merchandise while the others did switching elsewhere.

There is some conflict in the testimony as to whether there was one car or two cars. This, however, was a question of fact properly submitted to the jury, and there is substantial evidence to support the jury's finding.

There is no dispute about what constitutes spotting a car. Spotting the car, as all the witnesses said, is placing it either to be loaded or unloaded. Spotted, or put at the place where it is to be loaded or unloaded. The witnesses all agree, too, that if there is but one car to be spotted, the train puts this car in, spots it, or gets it to the place where it is intended to be loaded or unloaded, and then uncouples and pulls out, and leaves the car there where it is needed. This is not only the undisputed proof, but it would be foolish, if there was but one car to spot, to uncouple from this car, kick it in and then go in with the train and couple on to it again and put it to the proper place, spot it, and then uncouple and pull out. No one claims they do this. They do not spot cars this way when there is but one. They shove the car in, attached or coupled to the train, and, when they get the signal that the car is at the proper place, they stop them, uncouple, pull out, and leave the car there.

A blue-print is introduced, showing the location and situation of the points testified about, and, in addition to that, all the witnesses testify that deceased was standing at the end of the car, and, as some witnesses say, fix-

ing the coupling, and was in plain view of Rogers, the switchman, when he threw the switch, and before the car that was kicked in there had got to the switch; and, while Rogers swears that he did not see him, some of the witnesses swear that he was looking at him, and all testify that there was nothing to obstruct the view. That deceased was in plain view.

This suit is brought under the Federal Employers' Act, and, since this act does not define negligence, the question of whether the acts complained of amount to negligence is to be determined according to the common law and according to the rules prevailing in the Federal courts as to what constitutes negligence under the common law. However, there is no difference between the decisions of the Federal court and of this court as to what constitutes negligence.

The appellant contends that the Federal act does not embrace actions based upon the doctrine of discovered peril. It is contended that the discovered peril doctrine only embraces acts that are willful or intentional, and does not embrace negligent acts, and many decisions of this court are cited in support of that contention. However, some of those decisions are based on the original lookout statute and on the theory that no one owed a trespasser any duty until his peril was discovered, and that there was no liability unless he was wantonly and willfully injured after the discovery of his peril. Moreover, under the law of this State at the time of those decisions, contributory negligence was a bar to recovery, and a trespasser on the track could not recover unless his peril was discovered and he was thereafter wantonly and recklessly injured. The more recent opinions, however, are that the railroad company is liable to a trespasser if it could, by the exercise of ordinary care, avoid the injury after it discovered the peril. This case involves the doctrine of negligence pure and simple, and not intentional wrong.

This court has repeatedly held that, when the perilous position even of a trespasser is discovered, the rail-

ARK.]    MISSOURI PACIFIC RAILROAD CO. v. SKIPPER.    1097

road company is liable if it could, by the exercise of ordinary care after it discovered the peril, avoid the injury, and failed to exercise that care. In fact, the doctrine of discovered peril simply means that, when one person sees another in a place of danger or peril, he must exercise ordinary care to avoid injuring him, and, if he fails to do that, he is liable. It is a question of negligence or failure to exercise proper care.

It was said by the Texas court: "By the doctrine of discovered peril is meant that, where the danger of inflicting an injury is discovered by the person inflicting it in time to have prevented the injury by the exercise of proper care, he will be liable for injury proximately resulting from his own negligence, though the injury would not have occurred but for the previous negligence of the person injured." *Furst-Edwards & Co. v. St. Louis S. W. Ry. Co.* (Tex.), 146 S. W. 1024, 1026.

The Virginia court has said: "The doctrine of discovered peril is a qualification of the rule that contributory negligence bars a recovery, and involves the principle that, though plaintiff was guilty of negligence in exposing himself to peril, he may recover where defendant, after knowing of the danger, could have avoided the injury by the exercise of ordinary care, but failed to do so." *Chesapeake & O. Ry. Co. v. Corbin's Admr.,* 110 Va. 700, 67 S. E. 179.

The doctrine of discovered peril means, where one person discovers that another is in peril and negligently fails to use the means at his command to avoid the injury, when he could, by exercising reasonable care, have avoided the injury, he will be liable. To be sure, if one's peril were discovered, and thereafter the wrongdoer willfully and intentionally injured him, he would be liable. But there is no contention in this case that there was any willful or intentional injury, but the complaint alleges and the proof tends to show that, after the perilous position of deceased was discovered, the defendant's servants negligently and carelessly injured him.

The Federal act provides for a recovery for injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, etc. That is, if the negligence of the carrier or its servants or agents or employees causes the injury or the death, such carrier is liable, although the employee injured or killed was also guilty of negligence. It would indeed be a strange doctrine if a recovery could be had for negligence where the negligent servant did not happen to see the injured party at the time, and that no recovery could be had where he did see him.

The Congress, in passing the statute, evidently used the word negligence in the sense that it was generally used, or rather as it was defined, by the common law. And, so far as the liability is concerned, it is wholly immaterial whether the negligence that caused the injury was after the peril was discovered or before. The act makes the carrier liable whenever the injury or death results, in whole or in part, from the negligence of any officers, agents or employees of such carrier. It is therefore a question of negligence, and the negligence relied on in this case is negligence alleged to have occurred after the peril of deceased was discovered.

Lord Campbell's Act, referred to by appellant, provides for recovery for death by the wrongful act, neglect or default. This, however, is a State statute, and has no application here, because the Federal statute alone must be looked to in cases where injury results to an employee of an interstate carrier while engaged in commerce between the several States. The carrier must be engaged in interstate commerce, and the injured employee must be employed by such carrier in such commerce. And when an injury occurs to such employee while so engaged, the State statutes have no application, Lord Campbell's Act has no application, but whether or not there is liability must be determined by the Federal act alone.

We think there was ample proof to submit the question as to whether the appellant was guilty of negligence after the peril of deceased was discovered.

Gus Roberts was asked to tell the jury, after Rogers came to the switch and after witness came on the road there, whether or not he saw Rogers look down towards Mr. Skipper.   He said, "Yes sir, he was looking in that view all right, that is true enough."   If he was looking in that direction, all of the witnesses agree that there was nothing to prevent his seeing.

Witness Dave Holman was asked this question:   "I will ask you to tell the jury whether or not, before the car passed the switch, you saw Mr. Rogers looking down in the direction where Mr. Skipper was?"   And he answered: "He had his face turned in that direction, and was looking at him."   And again this witness said he was looking towards him and Mr. Skipper.   We therefore think it is sufficiently clear that he saw the deceased before the car came on to the house-track and before he threw the switch.

Appellant's next contention is that, under the Federal Employers' Liability Act, no duty devolves upon a railroad company or its agents to maintain a lookout for employees.   It is true that no statute requires the railroad company to keep a lookout.   What the Federal statute does is to make the carrier liable for its negligence or the negligence of its agents or employees, if such negligence, in whole or in part, causes the injury or death of an employee.   The lookout statute is not involved in any way.   It is unnecessary to decide whether, under the Federal statute, failure to keep a lookout might or might not constitute actionable negligence.   Certainly, if it was negligence and caused an injury, and the injured party did not assume the risk, the carrier would be liable. But that question is not involved in this case, and it is unnecessary to discuss further the question of a lookout.

It is next contended that the evidence is undisputed that the switching was being done under orders of the deceased conductor.   We do not agree with counsel in this contention.   That is, in the contention that the conductor instructed any one to kick the cars in there.   The evidence is conflicting on this question, but the preponder-

ance seems to be that the conductor instructed them to spot the car, and the testimony is undisputed that that means to put it at the place where it is to be loaded or unloaded.

The testimony is in conflict as to whether there was one or two cars, but the preponderance of the evidence, we think, shows that there was but one car to be spotted. At any rate, there is a conflict in the testimony on this question, and all of the evidence shows that, if there is but one car to be spotted, it is not kicked in, but is shoved in while still coupled to the train, and, when they get it to the place they desire to leave it, they uncouple, pull out, and leave it there.

Dave Holman testified, when asked to tell whether he heard Mr. Skipper give orders to the trainmen: ''Well, to spot that car.'' This witness also testified, when again asked if he remembered what Mr. Skipper said to those people: ''He told them to spot that car at the freight-house so it could be unloaded.'' He was then asked: ''Was there only one car to be put on the house-track?'' He answered: ''That was all. That was Mr. Skipper's orders.''

This witness further said he did not know which car it was, but he told them to spot the car there at the house. He understood what he meant by that—to set it in so that it could be unloaded. Said he had seen them many times carried in there with the engine. That that is what is meant by spotting a car.

As we have said, there is some testimony indicating that there were two cars to be put in, but whether there was one or two was a question for the jury.

Jay Tower, one of the witnesses of defendant, testified that, when they had more cars to go on, they would kick the car in and go back at the last and spot the cars. This witness also says: ''If we had been going to put only one car in there, we would have gone down with the train and spotted it. By spotting a car we mean— well, say there is a platform, and we are going to work a car of merchandise into the freight-house. A man that is standing here gives you a signal to back up like this.

When the car gets even with the door, he will flag you down. That spots it. You uncouple, go on off, and leave. In other words, that is placing a car by the platform so it can be unloaded. When you spot a car, you hold to it till you get it to the place where you want to leave it, then you uncouple from it and go on out.''

Will Rogers, the employee who threw the switch and let the car down there, said: ''Mr. Skipper told me, he says, 'Walter, you cut off the caboose here and cut the air out ahead of this A.R.T. car, kick it in on the house and shove four cars on the main line back to the caboose,'' and he says, ''Put the fifth car on the house, and you will work the merchandise while the boys put the train in the clear for the passenger train.''

Witness Newton testified that Skipper told him to put this car on the house-track. ''We had to make the switch and spot them so that we could go in and do our switching and leave the hind man to do the working of the freight.''

Another of defendant's witnesses, Chatterton, testified that they practically always kicked the cars in when there was more than one car.

It therefore appears that the evidence is conflicting as to whether there was one or two cars to be spotted, and also there is some conflict about the instructions which the conductor gave.

There was a great deal of testimony about deceased's injury and suffering, about what he said, about the defendant's witness swearing that he said it was his own fault, and considerable testimony about what deceased was doing at the time, but we think it is unnecessary to set out any more of the testimony, since the only contentions made are those to which we have already called attention, and, in addition to that, the contention of appellant as to instructions.

The appellant complains of the court's giving instruction No. 5, requested by the plaintiff, which is an instruction on assumed risk, and the reason urged by appellant why said instruction should not have been given is that it contends that there was no negligence on the

part of the defendant, and that the instruction was not applicable to the facts shown by the evidence and to plaintiff's cause of action based upon alleged discovered peril of deceased.

We have already shown that, while both parties talk about discovered peril, yet the suit is based on negligence —negligence alleged to have been committed after his peril was discovered, but it is none the less negligence because the plaintiff alleged when and how it occurred.

Appellant also complains of instructions Nos. 6 and 7. It argues that neither of these instructions were applicable to the cause of action alleged in plaintiff's complaint under the Federal Employers' Liability Act. What we have already said disposes of this contention.

It is next contended that the court erred in giving instruction No. 8 on the measure of damages. This instruction followed the Federal act by telling the jury that, if the deceased was guilty of negligence, it would be their duty to diminish the damages.

Appellant then contends that instructions requested by the defendant should have been given. We think the instructions given fully and fairly submitted the questions to the jury, and that there was no error either in giving or refusing to give instructions.

It is next contended that the court erred in permitting counsel for plaintiff to argue that the brakeman, Rogers, saw the deceased and was conscious of his perilous position. But, when appellant's attorney objected and asked how the car could have been diverted after it had been kicked over the switch, appellee's attorney said, "Why, of course it could not." What appellee's attorney was contending was that he saw the peril of deceased before the car reached the switch point and before Rogers had thrown the switch. And appellee's attorney stated that, after the car had been kicked, it was running at a rapid rate of speed, and Rogers saw deceased in a perilous position and appreciated his danger, and should not have shunted the car on the house-track. That is, if he saw the danger of deceased after the car was kicked and

before it reached the point of the switch, he should not have thrown the switch and thereby permitted the car to run down on deceased.

Appellant says that Congress has enacted no law, so far as it knows, providing for giving warning. This is not a question of giving warning. It is a question of whether the appellant was guilty of negligence in opening the switch and letting the car run down on deceased, who had his back turned to the switch, and doing this after he had discovered the peril of deceased.

The question of whether the appellant was guilty of negligence and whether deceased was guilty of negligence was a question of fact for the jury. And where a verdict is based on substantial evidence, this court will not disturb it.. There must, however, be substantial evidence, evidence about which fair-minded men might differ, and not a mere scintilla.

There was substantial evidence to support the verdict of the jury, and the court's charge as a whole correctly stated the law, and the judgment is therefore affirmed.