MISSOURI PACIFIC RAILROAD COMPANY *v.* HUFFMAN.

4-4713

Opinion delivered July 5, 1937.

*R. E. Wiley* and *Henry Donham,* for appellants.

*Steve Carrigan, J. H. Lookadoo* and *Tom W. Campbell,* for appellee.

MEHAFFY, J. Mrs. Ruth Huffman, administratrix of the estate of Albert H. Huffman, deceased, began this action against L. W. Baldwin and Guy A. Thompson, trustees, Missouri Pacific Railroad Company, debtor, and Harry Parker and Oliver Mosely, to recover damages for the injury and death of Albert H. Huffman.

She alleged in her complaint, in substance, that she was the duly appointed, qualified and acting administratrix of the estate of Albert H. Huffman, deceased, who was struck and killed in the town of Prescott, Arkansas, on December 20, 1933, by a passenger train owned

and operated at the time by the appellants, and which was in charge of and actually run and operated at the time by the appellant, Harry Parker, as engineer, and Oliver Mosely as fireman; that Huffman left surviving him as his sole and only heirs-at-law the appellee, Ruth Huffman, who was his wife, and their one son, now 20 years of age. The Missouri Pacific Railroad is a corporation and operates a line of railroad from St. Louis, Missouri, to Texarkana, Arkansas; that L. W. Baldwin and Guy A. Thompson were appointed trustees of the railroad company by the United States District Court in June, 1933; the appellant Harry Parker is a resident of Benton, Saline county, Arkansas, and Oliver Mosely is a resident of Gurdon, Clark county, Arkansas; that on December 20, 1933, the deceased, Albert H. Huffman, was driving in his automobile and proceeding to cross the tracks of appellants in the heart of the town of Prescott; that, as the said Huffman drove along Main street south to cross the railroad company's tracks, he approached said crossing and drove upon the tracks and one of appellants' freight trains was switching west of said crossing; that Huffman was watching said freight train switching in order to avoid being struck by it when he was crossing said track; appellants' passenger train, which was running late and was being operated by the appellants, the engine being driven by Harry Parker as engineer and Oliver Mosely as fireman, said train being run and operated without using ordinary care for the safety of Huffman and the public generally, was run into and through the town of Prescott at a high, excessive and dangerous rate of speed, and said train struck the automobile in which said Huffman was riding at the time, with such force as to throw the automobile from the crossing and throw it over and upon said Huffman so that he was injured and killed thereby; that the appellants failed to exercise ordinary care for the safety of Huffman and other persons who might have been crossing the tracks, in not keeping a lookout in order to discover the peril of those about to cross said railroad track, or crossing said tracks, in order to

avoid injuring Huffman or other persons, which could have been avoided by the exercise of reasonable care. The appellants failed to exercise ordinary care for the safety of persons at the crossing, and after they had discovered the position of peril, in failing to use reasonable care to avoid injuring the said Huffman; that said appellants did not exercise ordinary care by ringing the bell and sounding the whistle to warn said Albert H. Huffman of the approach of said train. By the use of care on the part of appellants, they could have avoided injuring Huffman. The railroad track is level and straight for about two miles east of the crossing. Said Huffman was at the time of his death a healthy and industrious young man, was engaged in useful and profitable labor, and was contributing to his wife and son, who were wholly dependent upon him, the sum of $1,200 per year. Said Huffman was 43 years of age at his death.

The appellants filed petition and bond for removal to the federal court, and the circuit court made an order removing the cause to the federal court. The federal court remanded the cause to the Clark county circuit court, from whence it was removed.

Appellants Parker and Mosely filed separate answer denying all the material allegations of the complaint and adopted the answer of the railroad company. The trustees, appellants, filed separate answer denying all the material allegations in the complaint, and alleging that the accident and injury was caused by the negligence of the deceased, Huffman.

Trial was had and the jury returned a verdict in favor of Oliver Mosely, but returned a verdict against Harry Parker and the trustees of the railroad company in the sum of $20,000. To reverse said judgment this appeal is prosecuted.

The substance of the evidence as set out by appellants in their abstract is as follows:

"Ruth Huffman, appellee, testified:

"I am the widow of Albert H. Huffman. He was killed by a Missouri Pacific train in the town of Pres-

cott on December 22, 1933. I have been appointed administratrix of his estate and am now acting as such.

"Mr. Huffman was 43 years old at the time he was killed and was in good health. He was a farmer and we lived on a farm. He had one child, a son, who was 19 years of age at the time of his death. The boy had finished school and was helping on the farm. His father supported him and put him through school. My husband supported me and kept up his home. He was just a regular farmer. He also made some money trading. I would say he made approximately $1,600 a year, which he used in farming and out of which he supported me. He required very little for himself. He was looking out for what he was always planning to do.

"I have lived at Prescott all my life, and I think my husband had lived there all of his life. He never lived in Clark county. This accident happened in the town of Prescott where my home is and which is the county seat of Nevada county. They have a court house there."

Harry Parker, the engineer, testified that on December 22, 1933, he was running the engine that struck and killed Albert Huffman.

Enoch Hale testified that he was a farmer, lived in the neighborhood of two miles of Prescott all his life; knew Albert Huffman; he was energetic and worked all the time; he was trustworthy; thinks he earned from $1,000 to $1,600 a year; after he paid his rent it would probably leave him $1,200 or $1,300 a year; his family consisted of his wife and one boy; he supported his family and educated his boy.

Lawrence Britt testified that he knew Albert Huffman, considered him a mighty good farmer; he was thrifty, a strong man, a good worker and energetic.

George Hunt testified that he knew Albert Huffman during his lifetime, worked with him four or five years, he was a good farmer and judged that his earnings would run from $1,000 to $2,000 a year. He treated his family nice and good as he could; he educated his boy and did as well as a man could do to take care of his family.

Ralph Owens testified and introduced a plat that he had made which showed the tracks and street and the situation. He testified that a man approaching the track on Main street could see a train 1,290 feet away for a distance of 70 feet before reaching the track; a train 600 feet from the crossing could be seen 150 feet from the track. There was no obstruction to prevent one's seeing it. There is a stop signal at the intersection of Main street and highway 67, also, a signal for the railroad track known as a tell-tell class; both signals are alike, and both of them work. A man on an engine can see a man coming up the track for the same distance as a man coming up to the track can see a train. There is no sidetrack across Main street and none across Walnut street.

Virgil James and his wife both testified that they crossed the tracks a block from where Huffman crossed about five minutes before Huffman was killed. There was a train south of the crossing switching around.

George Jones testified that he was driving along the street that parallels the road; was driving a truck about 25 or 30 miles an hour; the train that killed Huffman did not sound any whistle or ring any bell; it was running between 60 and 65 miles an hour; it stopped at the depot; did not examine the car much, but there was a dent about the back side of it; there was another train switching about the depot; he did not hear the crash and did not see the train stop at the station; the whistle on the train did not blow; if it had he would have heard it.

S. L. Jones, father of George Jones, testified to substantially the same things that George Jones did. He said that if the whistle had blown he would have heard it.

Loyd Lynch was with S. L. Jones and George Jones. He testified to substantially the same things that the Jones did.

A number of witnesses testified that the train was going very fast and that no signals were given. Some of them stated that the whistle blew about the time that it struck Huffman.

There is a conflict in the testimony as to the speed of the train, and also as to the signals. A number of wit-

nesses testified that there was a freight train switching south of the crossing and that the passenger was about an hour and a half late. The car was hit at the back end, showing that it had nearly crossed the track before the train struck it.

It was agreed that Huffman's expectancy was 26 years. Photographs were taken and introduced in evidence showing the situation.

H. D. Parker, the engineer, testified that he remembered the occasion of the train he was operating striking and killing Huffman; that he was sued in that case; he was running about an hour and a half late; he noticed Huffman's automobile approaching the track on the right side; he testified that Huffman was traveling at such a rate of speed he took it for granted that he was going to stop at the crossing; the automobile was going slowly; he said he thought the automobile was going to stop; he was keeping a lookout and knew this was a popular crossing; had his brakes on, but did not slow down, but went on and stopped at the station; when he saw Huffman he had the whistle open and the bell ringing; he said if he had shut off the steam and slackened the speed he did not know whether Huffman would have gotten over or not; he could stop the train within a train length at the speed he was going; if he had known in time that the man was going on ahead of him, he could have stopped before he reached the crossing; but he did not know that Huffman was not going to stop.

A number of witnesses were introduced by appellant and their evidence as to the speed of the train and the signals was in conflict with the evidence of appellee's witnesses.

Appellants first argue that the court erred in refusing to direct a verdict for appellants, and cite and quote from a great many cases which we do not discuss because the law is well settled in this jurisdiction, and unless the evidence shows that the appellants were guilty of negligence, there could be no recovery.

According to all of the evidence Huffman was driving slowly, at from 10 to 15 miles an hour, and just south of the crossing a freight train was switching, and this

freight train evidently sounded the signals. One witness testified that the passenger train was probably ten miles away when the signals were sounded. One of appellants' witnesses swore that when a train was late they always tried to make up time. The undisputed evidence shows that this train was about an hour and a half late.

Appellants urge that Huffman was guilty of negligence because he did not look to the north, the direction from which the passenger train came. As a matter of fact no one knows whether he looked north or not, but the situation south of the crossing where he was killed was created by the appellants, and if Huffman did what a man of ordinary prudence would have done under the circumstances, he was not guilty of negligence. Ordinarily, one approaching a railroad crossing must look and listen, but here was the situation created by the appellants that probably led Huffman to believe that the only danger was the danger from the freight train south of the crossing, and he was giving his attention particularly to this danger. He probably, also, knew that there was no train due from the north. This train that struck and killed him should have passed that place an hour and a half before.

It is true, appellants argue, that Huffman had gone to the depot with others, and they argue that he knew the train was late. He did go to the depot with Allen and others, and Allen got out of the car and bought him a ticket, but there is no evidence that Huffman got out of the car or that he knew anything about the time when the train would come; so that the only question was, whether he acted as a man of ordinary prudence would have acted under the circumstances. If he did, he was not guilty of negligence.

It has been said that due care does not mean constant, everlasting watchfulness, but it means such care only as a man of ordinary prudence would exercise under the circumstances.

Huffman was driving his car at a moderate rate of speed and his attention was necessarily attracted by the switching of the freight train. No train was due from the north. The train, according to the evidence, from

the north was traveling about 60 miles an hour, and numbers of witnesses say without sounding any warning at all. The appellants' evidence contradicts this, and they say that the train was traveling at its usual speed and that the signals were given, but the credibility of the witnesses and the weight to be given their testimony were questions for the jury, and they had a right to believe the evidence of appellee's witnesses, if they thought they were telling the truth, and we have no right to disturb their verdict, although we might think differently.

A number of witnesses, apparently uninterested, testified to the great speed of the train and the failure to give any warning of its approach. If, as testified to by some of appellee's witnesses, the train was running 55 or 60 miles an hour without giving any warning of its approach, the jury were justified in finding that the persons operating the train were guilty of negligence. It was going into the city of Prescott and going over one of the streets that was constantly traveled by the public; and if this is true, the jury were justified in finding that appellants were guilty of negligence.

In addition to this, however, the engineer saw Huffman in time to have avoided striking him at the speed the train was traveling. The engineer himself testifies that he could have stopped the train before he reached the crossing, but he thought Huffman would stop. He does not, however, testify to any fact that would indicate Huffman intended to stop. It is true, he says he was going slowly, but he was approaching the crossing and was close to it, and it is not pretended that his speed was reduced at all, so there was nothing to indicate that he intended to stop, and nothing to indicate that he knew about the approach of the train.

Appellants argue that the discovered peril doctrine is not involved. Without any regard to the lookout statute, if the engineer saw Huffman in time to avoid the injury, it was his duty to stop the train or reduce its speed, and the evidence shows that if he had reduced its speed very slightly Huffman could have crossed in safety. The engineer himself testifies that he could have stopped the

train before he reached the crossing after he saw Huffman.

The discovered peril doctrine may be involved without any regard to the lookout statute. This court quoted with approval the following from the Texas court: "By the doctrine of 'discovered peril' is meant that, where the danger of inflicting an injury is discovered by the person inflicting it in time to have prevented the injury by the exercise of proper care, he will be liable for injury proximately resulting from his own negligence, though the injury would not have occurred but for the previous negligence of the person injured." *Furst-Edwards & Co.* v. *St. Louis S. W. Ry. Co.*, 146 S. W. 1024, 1026.

We, also, said in *Missouri Pac. R. Co.* v. *Skipper*, 174 Ark. 1083, 298 S. W. 849: "The doctrine of discovered peril means, where one person discovers that another is in peril and negligently fails to use the means at his command to avoid the injury, when he could, by exercising reasonable care, have avoided the injury, he will be liable. To be sure, if one's peril were discovered, and thereafter the wrongdoer willfully and intentionally injured him, he would be liable. But there is no contention in this case that there was any willful or intentional injury, but the complaint alleges and the proof tends to show that, after the perilous position of deceased was discovered, the defendant's servants negligently and carelessly injured him."

The Virginia court has said: "The doctrine of discovered peril is a qualification of the rule that contributory negligence bars a recovery, and involves the principle that, though plaintiff was guilty of negligence in exposing himself to peril, he may recover where defendant, after knowing of the danger, could have avoided the injury by the exercise of ordinary care, but failed to do so." *Chesapeake & O. Ry. Co.* v. *Corbin's Admr.*, 110 Va. 700, 67 S. E. 179.

Appellants contend that the court erred in refusing to grant the petition for removal to the federal court at the conclusion of the testimony, and state: "The only ground upon which the state court had jurisdiction after

the filing of petition for removal was that there was a joint cause of action against the resident defendants and the nonresident defendants.''

In this case there was a joint cause of action against all of the appellants. If the engineer's testimony is to be believed, all the appellants are guilty of negligence, and jointly liable.

It is next contended that the court erred in refusing to give appellants' instruction No. 11. That instruction told the jury that a person must look and listen for approaching trains, and that he must do this at a time and at a place where he can see and hear a train if one is coming, and he must continue to look and listen until he gets across the track, and if he fails to do this he is guilty of negligence. It then told them that if they found from the evidence that deceased was negligent in failing to look and listen at a proper place and time and continue to look and listen as set forth in the instruction, and that if his negligence in this respect was equal to or greater than that of the employees, if any, then he could not recover. The court properly refused to give this instruction. It is the duty of everyone to exercise care, such care as a person of ordinary prudence would have exercised under the circumstances. Whether one is guilty of negligence or not must be determined by a consideration of his conduct and all the circumstances surrounding his actions.

It is next contended that the court erred in refusing to give instructions Nos. 8 and 13. This instruction, number 8, is erroneous for the same reason that number 11 is, and in addition to that, it says to the jury that the undisputed evidence shows that the deceased was negligent in these respects, and that his negligence contributed to his death. This instruction was erroneous and the court did not err in refusing to give it.

Instruction number 13 tells the jury that if the wigwag signal and crossing bell were operating, then it was the duty of deceased to stop his car, if necessary, when, as a matter of fact, the evidence showed that these signals were being sounded by the freight train at which he was looking.

The above instructions were erroneous because they ignored the issue of "discovered peril." If Huffman's peril was discovered by the engineer in time to have avoided the injury by the exercise of ordinary care, and he failed to exercise such care, appellants would be liable notwithstanding the negligence of Huffman.

Appellant objects to instruction No. 1 given at the request of appellee and also instruction No. 4. Objection is made to these instructions because appellants contend that the undisputed testimony disclosed that deceased was guilty of contributory negligence. The question of contributory negligence was for the jury, and not for the court; and, therefore, the court did not err in giving these instructions.

Courts are prohibited by the Constitution from instructing as to the facts, but must instruct as to the law, and the jury passes on the facts.

We think the instructions as a whole constituted a correct guide for the jury, and after a careful consideration of all the instructions, we have concluded that the court did not err in giving or refusing instructions.

We find no error, and the judgment is affirmed.

GRIFFIN SMITH, C. J., dissents.

Justices SMITH, McHANEY and BAKER concur.