## MISSOURI PAC. R. CO. et al. v. BALDWIN.

### No. 11796.

Circuit Court of Appeals, Eighth Circuit.

Feb. 10, 1941.

Rehearing Denied March 11, 1941.

Richard M. Ryan, of Hot Springs, Ark. (Henry Donham, of Little Rock, Ark., on the brief), for appellants.

Fred A. Isgrig, of Little Rock, Ark. (Gibson Witt and H. A. Tucker, both of Hot Springs, Ark., and John S. Gatewood, of Little Rock, Ark., on the brief), for appellee.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

The Missouri Pacific Railroad Company appeals from a judgment recovered by John Baldwin as father and next friend of his minor son, Jewell Baldwin, who was injured when a truck driven by one James Cox, in which Jewell was riding, was struck by a Missouri· Pacific passenger train at a grade crossing in Hot Springs, Arkansas.

The accident occurred on the ·main line track in the railroad yards within the city limits, at the point where the main line track crosses Gaines Avenue. The trains coming from Little Rock proceed in a southwesterly direction into the railroad yards of Hot Springs and go on across Gaines Avenue to a switch about 190 feet beyond the avenue and then back up in a northwesterly direction to the city depot. With James Cox at the steering wheel and Jewell Baldwin sitting on the driver's seat beside him, the truck, which had an unloaded trailer on behind, started from the home of Cox at the top of a little hill rising about forty feet higher than the railroad tracks and about two hundred and fifty or sixty feet distant from the crossing. The road they travelled down the hill was a gently curving, roughly gravelled, single car width road called Fairview Street or Adams Street, which runs into Gaines Avenue about twenty or twenty five feet before that avenue crosses the tracks. Gaines Avenue is gravelled and of two car widths. There was a sizable mud puddle in Fairview Street just ahead of where that street runs into Gaines Avenue.

The truck and trailer came down the hill in low gear to save the brakes and came almost to a dead stop at the mudhole, then proceeded in second gear into Gaines Avenue and onto the track just ahead of the passenger train. The train struck the back end of the truck where the trailer was attached, knocking the trailer to the south and the truck to the north of the track. James Cox, the driver, was not injured, but the truck and trailer which belonged to John Baldwin, Jewell's father, were wrecked, and Jewell received personal injuries.

He was about 17 or 18 years of age at the time of the accident and was helping James Cox to carry on the business of hauling wood. They were going to pick up a load at the time of the accident. The day

was bright and sunny and the time was between 12:30 and 1 o'clock P. M. Both knew the crossing. Cox had already crossed it three times that day and Jewell lived north of the track. Both knew a passenger train was due at about that time of day, although Jewell did not know what the exact hour of the day was at the time they approached the crossing.

As they drove very slowly through the mudhole both Cox and Jewell say they looked to the right for trains, but saw none and heard no warnings, such as whistles or bells. Cox shifted into second gear and they continued past a conspicuous railroad crossing warning post and onto the tracks, Cox meanwhile looking to the left. When on the tracks they both glanced again to the right and saw No. 219, a four coach passenger train approaching in dangerous proximity to them. The engineer of the train attempted unsuccessfully to avoid collision by applying emergency air brakes and succeeded in stopping the train in less than its length, one coach remaining on the northeast side of the crossing and one on the crossing after the train was stopped. Cox also tried unsuccessfully to speed up to get across. There was substantial evidence that Jewell sustained injuries of a permanent nature, described by some doctors as spondylolisthesis, or slipping of the fifth spinal vertebra, and also a fracture. He also had a spina bifida, or condition where from birth the neural arch or lumen had failed to heal, and he became crippled in consequence of his injuries.

At the trial, witnesses differed as to what view of the railroad tracks was obtainable from Fairview Street over which the truck had travelled. At the crossing itself, however, there was a clear and open view of the tracks for some 1,050 feet, at least. A picture taken from a Chevrolet sedan standing fifty five feet back from the tracks on Fairview Street shows that anyone in the car at that point could plainly see all of a train for a distance exceeding 600 feet down the track. Cox and Jewell Baldwin stated that they looked for a train when they were at the mudhole, some 20 to 30 feet before they got to the crossing. At this point one witness said the view was limited to 100 feet, another said 600 feet. Other witnesses stated the view extended distances intermediate between these figures; Jewell Baldwin said that at the point where he looked he could see 400 feet along the tracks in the direction from which the train came. Having failed to see a train within that distance, he did not look again until on the tracks. The engineer and fireman stated, concerning the speed of the train, that the yard speed limit was 15 miles per hour and that the engineer had put on air brakes to slow to that speed at a wye connection, more than a thousand feet northeast of the crossing. The fireman was on the left side of the train towards the approaching truck. He saw the truck slowing down and thought it was going to stop. When the truck failed to stop and continued on, he yelled at the engineer, who applied the emergency brakes and stopped the train in some 4/5 of its length in spite of the fact its air pressure was low from the train's previous slowing down. Both the engineer and the fireman testified that the engine's bell had been ringing on pull of an automatic switch turned on as the train entered the yards. They and other witnesses testified that the whistle had been continuously tooted from a point near the passed wye intersection.

There were several grade crossings before the Gaines Avenue crossing was reached. Several witnesses for plaintiff did not attempt to estimate the rate of speed at which they observed the train to approach the crossing. One witness for plaintiff stated that the train was "coasting". She later stated that it was going "fast". "About how fast?". "I couldn't say. It was going fast enough". Another said "It was coming in fast." Neither gave the criterion which to her or him differentiated between what was fast, what slow. Although plaintiff alleged in his petition that the train at the time of the accident "was travelling down grade upon its own momentum and at a high, excessive and dangerous rate of speed", his evidence failed to establish any definite rate. There was no direct evidence that the fireman was not keeping a lookout, as he said he was. The principal count of negligence which plaintiff relied on was the allegation that the train failed to give warning of its approach as required by Arkansas statute. Pope's Digest, Laws of Arkansas, § 11135.

At the close of all the evidence the railroad company moved for directed verdict, which was denied, and the case was submitted to the jury on the theory that the Arkansas comparative negligence statute was applicable. The jury returned a verdict for plaintiff in the amount of $5,500.

The railroad company thereafter moved for a new trial, but it did not move for judgment notwithstanding the verdict or renew its motion for a directed verdict. The motion for new trial was denied and the railroad company appeals from the judgment upon several grounds, including the ground that the evidence was not sufficient to sustain the verdict.

■ The grounds of negligence submitted to the jury were the alleged failure to give a signal, failure to keep a lookout, and running at a speed faster than that justified by public need and necessity. We ·hink that under the law of Arkansas the issues as to the alleged failure to keep a lookout, or as to the alleged excessive speed, should not have been submitted.

In the recent case of Missouri Pac. R. Co. v. Moore, 199 Ark. 1035, 138 S.W.2d 384, where an automobile and train collided at a crossing, the fireman testified that he was keeping a lookout and gave warning to the engineer as soon as it became apparent that the automobile was in danger. The Supreme Court of Arkansas held that a jury could not disregard this undisputed evidence. In the present case we find no evidence in the record which contradicts the fireman's statement that he was keeping a lookout and warned the engineer when it appeared the truck was not going to stop. The fireman's testimony is consistent with other facts proven. We think that Missouri Pac. R. Co. v. Moore, supra, is controlling on this issue and that the issue of failure to keep a lookout should not have been submitted to the jury.

■ The issue of excessive speed stands in much the same situation, since plaintiff's witnesses were not requested to establish either a rate of speed for the train or some criterion as to what they considered "fast." Plaintiff's attorneys established on cross-examination of train employees that they would be docked, or given demerits, possibly discharged, if they operated the train in violation of rules, that is, ran the train through the yards in which they were operating faster than 15 miles per hour. It was undisputed that the train's movement required it to stop a short distance beyond the Gaines Avenue crossing and then to back up to the Hot Springs depot, and it was the plaintiff's theory that at the time of accident the train was coming down the track on its own momentum rather than operating under steam power. Under the circumstances, an uncertain use of the adjective "fast", used without setting a rate of speed or statement whether the train was merely "fast" within yard rules,—which would mean travelling at the full authorized rate of 15 miles per hour,—could not overcome the definite uncontradicted testimony of the engineer and fireman that the train was going 15 miles an hour, especially in view of the fact that the train was close to the point where it was to stop and back up. Excessive speed was not proved by substantial evidence.

It does appear, however, that there was some evidence in the case tending to prove that there was no warning signal given by the trainmen, although there was very strong contradiction. The briefs contain full discussion of the question whether the evidence on the whole was sufficient to take the case to the jury.

To sustain its contention that the trial court erred in refusing to direct a verdict in its favor, the railroad company has presented numerous decisions of the Supreme Court of Arkansas, including Missouri Pac. R. Co. v. Davis, 197 Ark. 830, 125 S.W.2d 785; Missouri Pac. R. Co. v. Hood, 198 Ark. 792, 131 S.W.2d 615; Missouri Pac. R. Co. v. Price, 199 Ark. 346, 133 S.W.2d 645; Jemell v. St. Louis-Southwestern Railroad Co., 178 Ark. 578, 11 S.W.2d 449; St. Louis-San Francisco Ry. Co. v. McClinton, 178 Ark. 73, 9 S.W.2d 1060; Chicago, R. I. & P. R. Co. v. Batsel, 100 Ark. 526, 140 S. W. 726; Missouri Pac. Ry. Co. v. Moore, 199 Ark. 1035, 138 S.W.2d 384. It also cites Bradley v. Missouri Pac. R. Co., 8 Cir., 288 F. 484. All of these decisions relate to railroad crossing accident cases and in our examination of them we find much to support the appellant's contention that the evidence here is insufficient. The decisions indicate that the Arkansas court ·has reached conclusions and has made declarations which would justify holding that there was no case here for the jury. On the other hand, the appellee has cited and argued from the following decisions to support his judgment: Missouri Pac. R. Co. v. Barham, 198 Ark. 158, 128 S.W. 2d 353; Missouri Pac. R. Co. v. Huffman, 194 Ark. 456, 108 S.W.2d 479; Chicago, R. I. & P. R. Co. v. Thomas, 184 Ark. 457, 42 S.W.2d 762; Baldwin v. Brim, 192 Ark. 252, 91 S.W.2d 255; Missouri Pac. R. Co. v. Creekmore, 193 Ark. 722, 102 S.W.2d

553; Missouri Pac. R. Co. v. Taylor, 200 Ark. 1, 137 S.W.2d 747; Missouri Pac. R. Co. v. Eubanks, 200 Ark. 483, 139 S.W.2d 413. In these decisions, which also relate to railroad crossing accident cases, there are declarations or conclusions or both which would tend to support the judgment for the appellee.

We had occasion to examine the Arkansas railroad crossing accident cases in Kansas City Southern R. Co. v. Ray, 8 Cir., 109 F.2d 708, but on this appeal we are bound to notice additional relevant decisions of the state court handed down since the trial of this case in the federal district court. Vandenbark v. Owens-Illinois Glass Co., 61 S.Ct. 347, 85 L.Ed. ——, decided January 6, 1941. Two such decisions, Crossett Lumber Co. v. Cater, Ark., 144 S.W.2d 1074, decided November 25, 1940, and Missouri Pac. R. Co. v. King, 200 Ark. 1066, 143 S.W.2d 55, decided September 30, 1940, are called to our attention. Although the facts involved in these last cases are not the same as in the case at bar, they make it clear that notwithstanding the comparative negligence statute of Arkansas, Pope's Dig.Ark. § 11153, there can be no recovery against a railroad for negligent operation of its trains in cases where the only reasonable inference from the evidence is that the negligence of the plaintiff was the sole proximate cause of the injury, and that negligence of the railroad was not a proximate cause.

In Crossett Lumber Co. v. Cater, supra [144 S.W.2d 1076], the court said:

"Proximate cause of the injury was inattention upon the part of occupants of the car, and faulty brakes. The fireman was not negligent, after observing that the automobile was approaching at a low rate of speed, in assuming it would come to a stop before entering the crossing. We said in Blytheville, Leachville & Arkansas Southern Railway Company v. Gessell, 158 Ark. 569, 250 S.W. 881, 882: 'The operatives of trains have the right to assume that a traveler or a pedestrian approaching a railroad track will act in response to the dictates of ordinary prudence and the instinct of self-preservation and will, in fact, stop before placing himself in peril, and the duty of the railroad employees to take precautions begins only when it becomes apparent that the traveler at a crossing will not do so'.

"This declaration of the law does not, of course, relieve operators of a railroad or those permissively using its facilities from exercising that degree of care imposed in a given case by statute or arising under the common law, but it is authority for the practical, common sense proposition that when those in control of a slow-moving locomotive see an automobile or other vehicle approaching a crossing, and the manner of approach in respect of speed and control is such that, in view of attending physical conditions (such as grade, relation of track to roadway, visibility, etc.) a normal person could, and a reasonably prudent person would, see the train and stop, responsibility for disaster will not be shifted to a non-offending defendant. Missouri Pacific Railroad Co. v. Harden, 197 Ark. 899, 125 S.W.2d 466."

In Missouri Pac. R. Co. v. King, supra [200 Ark. 1066, 143 S.W.2d 58], the court said:

"Prior to the passage of our comparative negligence statute, Section 11153, Pope's Digest, any negligence on the part of a traveler contributing to his injury would have defeated a recovery of damages on his part; but the effect of this statute is to permit a recovery, notwithstanding the negligence of the person injured, if that negligence is of less degree than that of the operatives of the train. * * *

"Negligence on the part of the railroad company, although it contributes to the injury, does not alone suffice. It is essential that this negligence be of a greater degree than that of the person injured."

The application of these declarations to the evidence in this case compels the conclusion that the evidence as a whole was not sufficient to make a case for the jury. It was established so clearly that reasonable minds could not differ that the truck in which Jewell Baldwin was riding came to a stop, or nearly so, at a point from which the railroad tracks and the approaching train were in plain view; that the train remained within the scope of vision while the truck proceeded slowly in second gear onto the crossing in front of it; that the train operatives were not at fault in failing to stop the train before they did stop it, and that the negligent operation of the truck was the sole proximate cause of the accident. The court erred in refusing to direct a verdict.

But as the only motion of the railroad company after the verdict was for a new trial, the judgment is reversed for the errors we have pointed out and the cause is

Remanded for new trial.