*Decision will be entered under Rule 50.*

MAY B. KASS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 570–70.    Filed May 16, 1973.

---

*Jules Silk* and *Harvey N. Shapiro*, for the petitioner.
*Howard W. Gordon*, for the respondent.

OPINION

DAWSON, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the year 1966 in the amount of $10,134.67.

The only issue for decision is whether petitioner, a minority shareholder of an 84-percent-owned subsidiary, must recognize gain upon the receipt of the parent's stock pursuant to a statutory merger of the subsidiary into the parent.

This case was submitted under Rule 30, Tax Court Rules of Practice. The facts are fully stipulated. We adopt the stipulation of the parties and the exhibits attached thereto as our findings. The pertinent facts are summarized below.

May B. Kass (herein called petitioner) is an individual who, at the time of filing her petition herein, resided in Philadelphia, Pa. She filed her Federal income tax return for the taxable year 1966 with the district director of internal revenue at Philadelphia.

For a period greater than 6 months prior to 1965, petitioner had owned 2,000 shares of common stock of Atlantic City Racing Association (herein called ACRA). Her basis in the stock was $1,000. The stock in her hands was a capital asset.

ACRA was a New Jersey corporation which was formed in 1943 and which was engaged in the business of operating a racetrack. Its total authorized and outstanding stock consisted of 506,000 shares of common stock. It had approximately 500 stockholders.

Track Associates, Inc. (herein called TRACK), is a New Jersey corporation which was formed on November 19, 1965. The total authorized capital stock of TRACK consisted of 500,000 shares of common stock. Its original capitalization consisted of 202,577 shares. Over 50 percent of the original issue was acquired by the Levy family and 8 percent was acquired by the Casey family. The remaining stock went to 18 other individuals. The Levys and the Caseys were also minority shareholders (whether computed separately or as a group) in ACRA. Their purpose in forming TRACK was to gain control over ACRA's

racetrack business. They wanted to do away with ACRA's cumbersome capital structure and institute a new corporate policy with regard to capital improvements and higher purses for the races. Control was to be gained by establishing TRACK and then by (1) having TRACK purchase at least 80 percent of the stock of ACRA and (2) subsequently merging ACRA into TRACK.

The Levys acquired 48,300 shares of TRACK stock (out of the total original capitalization of 202,577 shares) in exchange for stock of ACRA. The Caseys acquired 3,450 shares in exchange for their ACRA stock. Together the Levys and Caseys purchased an additional 70,823 shares of TRACK stock as part of the original capitalization.

On December 1, 1965, TRACK offered to purchase the stock of ACRA at $22 per share, subject to the condition that at least 405,000 shares (slightly more than 80 percent of ACRA's outstanding shares) be tendered. As a result of this tender offer, which terminated on February 11, 1966, 424,764 shares of ACRA stock were received and paid for by TRACK. A total of 29,486 shares of ACRA stock were not tendered.[1]

The board of directors of TRACK approved a plan of liquidation providing for the liquidation of ACRA by way of merger into TRACK. ACRA and TRACK, through their directors, entered into a joint agreement of merger on February 11, 1966, which agreement provided that upon shareholder approval ACRA would "be merged with and into TRACK * * * pursuant to the provisions of Title 14 of the Revised Statutes of the State of New Jersey." At a special meeting of the shareholders of ACRA held on March 8, 1966, the aforementioned plan of liquidation and joint agreement were adopted. A copy of the notice of the meeting was sent to the petitioner, and it notified petitioner of the rights of a dissenting stockholder under New Jersey corporate law.

The merger having taken place, the remaining shares of ACRA that were not sold pursuant to the tender offer or the dissenting shareholder provisions were exchanged for TRACK stock, 1 for 1. The petitioner exchanged 2,000 shares of ACRA stock, with a fair market value at the time of $22 per share, for 2,000 shares of TRACK stock. She did not report any capital gain in connection with this transaction.

Petitioner contends that the merger of ACRA into TRACK, although treated at least in part as a liquidation at the corporate level, is at her level, the shareholder level, (1) a true statutory merger and

---

[1] All 506,000 shares of ACRA stock can be accounted for as follows: 51,750 (10.23 percent) were transferred to TRACK upon formation; 424,764 (83.95 percent) were purchased by TRACK following the tender offer; 29,486 (5.82 percent) remained in the hands of minority shareholders such as the petitioner.

(2) a section 368(a)(1)(A)[2] reorganization, occasioning no recognition of gain on the ensuing exchange. In support of this she cites *Madison Square Garden Corp.*, 58 T.C. 619 (1972). Respondent, on the other hand, argues that the purchase of stock by TRACK and the liquidation of ACRA into TRACK, which took the form of a merger, must be viewed at all levels as an integrated transaction; that the statutory merger does not qualify as a reorganization because it fails the continuity-of-interest test; and that, as a consequence, petitioner falls outside of section 354(a)(1)[3] and must recognize gain pursuant to section 1002.[4]

The problems presented by these facts are somewhat complex, and the solutions, according to the commentators, are less than clear.[5] Stated one way, the question is whether a statutory merger that follows a section 334(b)(3) "purchase" and serves the purpose of a section 332, 334(b) "complete liquidation" can qualify as an "A" reorganization at the shareholder level and, if so, when. Put another way, does the merger of ACRA into TRACK fall under section 368(a)(1)(A), thus placing the exchange of petitioner's ACRA stock for TRACK stock within the applicable nonrecognition provision?

Respondent does not take the position that a statutory merger, such as the one we have here, can never qualify for reorganization-nonrecognition status. He admits that "Theoretically, it is possible for TRACK to get a stepped-up basis in 83.95 percent of the assets of ACRA per section 334(b)(2), IRC upon a section 332, IRC liquidation of ACRA into TRACK and at the same time allow nonrecognition reorganization treatment to minority shareholders." Rather, his position is simply

---

[2] Unless otherwise specified, all statutory references are to the Internal Revenue Code of 1954 as in effect for the years in question.

Hereafter we will use "statutory merger" to refer to a merger which might or might not qualify as a sec. 368 reorganization and "'A' reorganization" to refer to a statutory merger that definitely does qualify.

Sec. 368(a)(1)(A) provides as follows:

SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(a) REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I or II and this part, the term "reorganization" means—

(A) a statutory merger or consolidation;

[3] SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

(a) GENERAL RULE.—

(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

[4] SEC. 1002. RECOGNITION OF GAIN OR LOSS.

Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized.

[5] See, e.g., Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 14–110—14–111 (1971); MacLean, "Creeping Acquisitions," 21 Tax L. Rev. 345, 379 fn. 89 (1966).

that the merger in question fails to meet the time-honored continuity-of-interest test.[6] We agree with this and so hold.

Section 334(b)(2)[7] and the reorganization provisions might apply to the same transaction only in certain cases where the continuity-of-interest test is met. See sec. 332 (last sentence, last independent clause); sec. 1.332-2(d) and (e), Income Tax Regs.[8] Reorganization treatment

---

[6] For an explanation of the test, see Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 14-16—14-26 (1971).

[7] SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(b) LIQUIDATION OF SUBSIDIARY.—

\*        \*        \*        \*        \*        \*        \*

(2) EXCEPTION.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

(A) the distribution is pursuant to a plan of liquidation adopted—

(i) on or after June 22, 1954, and

(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction) ; and

(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a 12-month period beginning with the earlier of—

(i) the date of the first acquisition by purchase of such stock, or

(ii) if any of such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made,

then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items.

[8] Sec. 1.332-2 Requirements for nonrecognition of gain or loss.

(d) If a transaction constitutes a distribution in complete liquidation within the meaning of the Internal Revenue Code of 1954 and satisfies the requirements of section 332, it is not material that it is otherwise described under the local law. If a liquidating corporation distributes all of its property in complete liquidation and if pursuant to the plan for such complete liquidation a corporation owning the specified amount of stock in the liquidating corporation receives property constituting amounts distributed in complete liquidation within the meaning of the Code and also receives other property attributable to shares not owned by it, the transfer of the property to the recipient corporation shall not be treated, by reason of the receipt of such other property, as not being a distribution (or one of a series of distributions) in complete cancellation or redemption of all of the stock of the liquidating corporation within the meaning of section 332, even though for purposes of those provisions relating to corporate reorganizations the amount received by the recipient corporation in excess of its ratable share is regarded as acquired upon the issuance of its stock or securities in a tax-free exchange as described in section 361 and the cancellation or redemption of the stock not owned by the recipient corporation is treated as occurring as a result of a tax-free exchange described in section 354.

(e) The application of these rules may be illustrated by the following example:

*Example.* On September 1, 1954, the M Corporation had outstanding capital stock consisting of 3,000 shares of common stock, par value $100 a share, and 1,000 shares of preferred stock, par value $100 a share, which preferred stock was limited and preferred as to dividends and had no voting rights. On that date, and thereafter until the date of dissolution of the M Corporation, the O Corporation owned 2,500 shares of common stock

is appropriate when the parent's stock ownership in the subsidiary was not acquired as a step in a plan to acquire assets of the subsidiary: the parent's stockholding can be counted as contributing to continuity-of-interest, so that since such holding represented more than 80 percent of the stock of the subsidiary, the continuity-of-interest test would be met. Reorganization treatment is inappropriate when the parent's stock ownership in the subsidiary was purchased as the first step in a plan to acquire the subsidiary's assets in conformance with the provisions of section 334(b)(2).[9] The parent's stockholding could not be counted towards continuity-of-interest, so in the last example there would be a continuity-of-interest of less than 20 percent. (Less than 20-percent continuity would be significantly less continuity-of-interest than that allowed in *John A. Nelson Co.* v. *Helvering,* 296 U.S. 374 (1935).) In short, where the parent's stock interest is "old and cold," it may contribute to continuity-of-interest. Where the parent's interest is not "old and cold," the sale of shares by the majority of shareholders actually detracts from continuity-of-interest.[10]

In petitioner's case, TRACK's stock in ACRA was acquired as part of an integrated plan to obtain control over ACRA's business. The plan called for, first, the purchase of stock and, second, the subsidiary-into-parent merger. Accordingly, continuity-of-interest must be measured by looking to all the pre-tender offer stockholders rather than to the parent (TRACK) and the nontendering stockholders only; and by that measure the merger fails and petitioner must recognize her gain.

The result reached in *Madison Square Garden Corp.*, *supra*,[11] is, at first blush, inconsistent with the result reached in this case. The apparent inconsistency is due to the manner in which *Madison Square Garden* was argued and the way its issues were framed by the parties.

---

of the M Corporation. By statutory merger consummated on October 1, 1954, pursuant to a plan of liquidation adopted on September 1, 1954, the M Corporation was merged into the O Corporation, the O Corporation under the plan issuing stock which was received by the other holders of the stock of the M Corporation. The receipt by the O Corporation of the properties of the M Corporation is a distribution received by the O Corporation in complete liquidation of the M Corporation within the meaning of section 332, and no gain or loss is recognized as the result of the receipt of such properties.

Sec. 1.332–5 Distributions in liquidation as affecting minority interests.

Upon the liquidation of a corporation in pursuance of a plan of complete liquidation, the gain or loss of minority shareholders shall be determined without regard to section 332, since it does not apply to that part of distributions in liquidation received by minority shareholders.

[9] We express no opinion as to whether such treatment would be appropriate in the case of a plan to acquire the subsidiary's assets, which is then not implemented so as to meet the requirements of sec. 334(b)(2). Cf. *American Potash & Chemical Corporation* v. *United States*, 399 F.2d 194 (Ct. Cl. 1968).

[10] See generally MacLean, "Creeping Acquisitions," 21 Tax L. Rev. 345 (1966).

[11] A supplemental order in the case dated Jan. 15, 1973, adds nothing of relevance to this case.

In *Madison Square Garden* the principal issue was whether the taxpayer could "back around" the 80-percent ownership test imbedded in section 334(b)(2) by purchasing a controlling interest in the corporation to be acquired, having that corporation redeem some of its stock from other shareholders, and then purchasing a little more stock—just enough to increase its stockholdings over the 80-percent mark. We held that the transaction qualified, section 334(b)(2) being a largely mechanical area. The issue with which we are presently concerned in this case was raised by the taxpayer (Madison Square Garden) in an amendment to its petition. The taxpayer, the acquiring parent corporation, claimed that it was entitled to a step-up in the basis of the assets received with reference to the stock that it had purchased *and* a step-up in the basis of the assets received in the statutory merger, though the stock to which those assets were "attached" belonged to minority shareholders. The latter portion of the claim conflicted with the position taken on its return. It is important to note that in *Madison Square Garden*, as in the instant case, there was a section 334(b)(2) "purchase" followed by a statutory merger and that the two steps were obviously part of an integrated plan. On this secondary issue, the Commissioner argued that section 334(b)(2) gives a stepped-up or cost-of-stock basis only to "property received with reference to stock owned immediately before the liquidation [or statutory merger treated as a liquidation for section 332 purposes]." Since Madison Square Garden owned only 80.22 percent of the stock immediately before the merger, it should be limited in a step-up in basis to only 80.22 percent of the assets received. Thus the Commissioner took a very narrow view of the applicable law, basing his arguments on section 334(b)(2) and the regulations thereunder. Likewise, Madison Square Garden argued solely in terms of section 334(b)(2).[12] Neither party mentioned the possibility that the minority shareholders, who were not parties to the proceeding, might recognize gain (because the two-step transaction was integrated and thus there was no continuity-of-interest) and therefore the corporation should get a step-up in basis to reflect the tax at the shareholder level, on the theory that a nonqualifying reorganization is simply a purchase or sale. Confronted with these arguments and the narrowly framed issue, this Court held that Madison Square Garden, the acquiring parent, was not entitled to a step-up in basis *under section 334(b)(2)* as to part of the property.

---

[12] In his opening statement the attorney for Madison Square Garden stated as follows:
"The remaining legal issue is a relatively simple one to state. It may not be quite so simple to resolve. The issue is whether the merger of the Madison Square Garden Corporation into petitioner * * * fell or falls within the purview of Section 334(b)(2) of the Internal Revenue Code so that petitioner is entitled to step up the basis of Madison Square Garden's assets acquired on that merger to the basis of the stock with respect to which the distribution was made."

In the present case, with essentially the same facts but the minority shareholder as petitioner, respondent argues that the statutory merger is a nonqualifying reorganization, thus a sale, thus taxable at the shareholder level. Although technically he need not mention the corporate basis aspects nor sections 334(b)(2) and 332, respondent frankly admits that at the corporate level he would allow the assets received with reference to the stock belonging to the minority shareholders a stepped-up basis.[13] This admission by the respondent unavoidably conflicts with the result argued for and achieved in *Madison Square Garden.*[14]

Faced with the general rule as the applicability of the continuity-of-interest test, petitioner makes the following arguments, which we will deal with separately.

*One*, the continuity-of-interest doctrine should not be applied because TRACK was formed by a few stockholders in ACRA in order to purchase the business and, in the process, to acquire a stepped-up basis for as many of the assets as possible via section 334(b)(2). "In effect, the situation was the same as the sale of stock by some shareholders to other shareholders." The petitioner meets herself coming, so to speak, when making this argument. Confronted with the problem of how to characterize the second event in the present two-event transaction, she contends that the transaction was a true statutory merger in both form and substance, at least insofar as she, a minority shareholder, was concerned. Now, confronted with the continuity-of-interest problem, she would have us treat the transaction in a manner inconsistent with the characterization previously given to the transaction, that of a merger. Furthermore, the parties to these events (the selling shareholders of ACRA, the organizers of TRACK, and the nontendering, nondissenting shareholders such as the petitioner) chose the steps that were followed.[15] To allow one of them in a separate proceeding

---

[13] In his reply brief the respondent states:

"This result is occasioned by the fact that the receipt, by the minority shareholders * * * of TRACK [parent] stock and ACRA's [the subsidiary's] assets by TRACK was a distribution in complete liquidation. The minority shareholders thus recognize their gain and the acquiring corporation is entitled to a stepped-up basis in the assets attributable to the stock of the minority shareholders. This is because the value of the minority's interest is treated as a liability assumed by the acquiring corporation. See Rev. Rul. 59-412, 1952-2 C.B. 108. * * * It follows that in situations where the minority shareholders are given reorganization treatment the acquiring corporation gets a carryover basis in the assets represented by the stock of the minority shareholders."

[14] We need not answer the question: What basis does the acquiring corporation take where the statutory merger passes the continuity test and minority shareholders are entitled to a nonrecognition of gain? Does the corporation receive a carryover basis for the less-than-20% portion of the assets under sec. 362(b) or secs. 332 and 334(b)(1)?

[15] We realize that in one sense petitioner was not privy to the plans of the Levys and the Caseys. In another sense—in the same way that all shareholders in a corporation play a part in major corporate decisions—she was a party to the choice of steps taken. Certainly she was informed of the events taking place.

to characterize the facts as being in substance something else would lay the groundwork for an enormous amount of "whipsawing" by and against both taxpayers and the Government.

*Two*, in applying the continuity-of-interest test, if it is applied, the purchase of stock by TRACK and the subsequent merger should not be viewed as steps in an integrated transaction because the choice of merger over liquidation as a second step had independent significance to the minority shareholders and either choice would have suited TRACK. By so arguing, the petitioner attempts in effect to avoid the step-transaction doctrine and thus to limit the application of the continuity-of-interest test. If the merger can be separated from the stock purchase, the continuity-of-interest test might be applicable only with regard to ACRA's shareholders at the time of the statutory merger, namely, the parent corporation, TRACK, and the minority shareholders, including petitioner. We note at least one flaw: The choice—liquidation or merger—did make a difference to TRACK. If it had liquidated ACRA, TRACK would not have received all of ACRA's assets. Some of the assets would have gone to the minority shareholders, and it would have had to have purchased them from these shareholders at an additional price. By choosing to merge ACRA into itself, it was able to avoid this and other problems.

*Three*, if the purchase and merger are to be viewed as parts of a single transaction for continuity and reorganization purposes, then the incorporation of TRACK should also be integrated into the transaction for section 351 purposes; thus the petitioner should be viewed as having participated in a tax-free section 351 transaction along with the Levys and Caseys. Briefly, the answer to this argument is that while the purchase and the merger were interdependent events, petitioner's exchange of ACRA stock for TRACK stock was not "mutually interdependent" with the incorporation transfers made by the Levys, Caseys, and 18 other individuals. *American Bantam Car Co.*, 11 T.C. 397, 405–407 (1948), affirmed per curiam 117 F. 2d 513 (C.A. 3, 1949). This result merely illustrates the truism that the step-transaction doctrine, even when worded consistently (see Mintz & Plumb, "Step Transactions in Corporate Reorganizations," 12th Ann. N.Y.U. Tax Inst. 247 (1953)) and applied to identical facts, may result in integration in one case and "separateness" in another case simply because the legal question to be answered has changed. See *King Enterprises, Inc.* v. *United States*, 418 F.2d 511, 516–519 (Ct. Cl. 1969).

*Four*, assuming that the continuity-of-interest test is applied, it is met where all 16 percent of the stockholders of ACRA exchanged their stock for a total of 35 percent of the stock of TRACK. The 16-percent figure (really 16.04 percent) is the sum of the percentage of ACRA

stock transferred to TRACK at the time of TRACK's formation (10.22 percent) plus the percentage of ACRA stock exchanged for TRACK stock following the statutory merger (5.82 percent). Fortunately, we need not engage in a game of percentages since the continuity figure argued for by petitioner, 16 percent, is not "tantalizingly" high. The plain fact that more than 80 percent of the shareholders of ACRA sold out for cash is sufficient to prevent this merger from meeting the quantitative test expressed in the *Southwest Natural Gas Co.* v. *Commissioner*, 189 F. 2d 332, 334 (C.A. 5, 1951), affirming 14 T.C. 81 (1950):

While no precise formula has been expressed for determining whether there has been retention of the requisite interest, it seems clear that the requirement of continuity of interest consistent with the statutory intent is not fulfilled in the absence of a showing: (1) that the transferor corporation or its shareholders retained a substantial proprietary stake in the enterprise represented by a material interest in the affairs of the transferee corporation, and, (2) *that such retained interest represents a substantial part of the value of the property transferred.* [Emphasis added.]

The two Supreme Court cases on point are *John A. Nelson Co.* v. *Helvering, supra,* and *Helvering* v. *Minnesota Tea Co.,* 296 U.S. 378 (1935).

Finally, we emphasize that the petitioner is not any worse off than her fellow shareholders who sold their stock. She could have also received money instead of stock had she chosen to sell or to dissent from the merger. The nonrecognition of a realized gain is always an important matter. We hold that petitioner is not entitled to such favorable treatment in this case.

Reviewed by the Court.

*Decision will be entered for the respondent.*