SUPERIOR COACH OF FLORIDA, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9833–78.     Filed May 16, 1983.

---

*Aldo Icardi*, for the petitioner.
*J. Michael Melvin*, for the respondent.

Simpson, *Judge*: The Commissioner determined a deficiency of $54,761 in the petitioner's Federal income tax for 1974. After concessions by the petitioner, the issues for decision are: (1) Whether the petitioner may utilize a net operating loss acquired pursuant to a statutory merger; and (2) whether the Commissioner's revaluation of the petitioner's ending inventory constituted a change of the petitioner's accounting method within the meaning of section 481 of the Internal Revenue Code of 1954.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Superior Coach of Florida, Inc. (SCF), is a Florida corporation which had its principal place of business in Orlando, Fla., at the time it filed its petition in this case. It filed its Federal corporate income tax returns for 1974 and 1975 with the Internal Revenue Service Center, Chamblee, Ga. On such returns, SCF indicated that it valued its inventory on the basis of the lower of cost or market.

SCF was organized in the State of Florida in 1961 and was the exclusive franchise dealer for school buses manufactured by Superior Coach (Superior). Byerly Superior Coach Sales, Inc. (Byerly), was a Florida corporation engaged in the sale and servicing of buses, motor homes, limousines, and ambulances. Byerly was Superior's exclusive franchise dealer in Florida for professional and recreational vehicles. Daniel E. Zaffran was the president of SCF, and Howard Byerly was the president of Byerly.

Superior had granted franchises to 33 dealers throughout the United States and Canada. Before granting a franchise, Superior had to be satisfied that the dealer had the necessary financial resources and qualified personnel. If the dealer had

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.

more than one franchise, it was required to have a separate staff to handle the professional vehicles.

Sometime in 1973 or 1974, as a result of the energy crisis, the market for motor homes and recreational vehicles dropped sharply, and Superior was informed that Byerly did not have the financial resources to satisfactorily maintain its franchise. At or about the same time, Mr. Byerly informed Mr. Zaffran of his financial difficulties. After some discussion, Mr. Zaffran and Mr. Byerly concluded that it would be advantageous to merge their operations. Sometime prior to September 16, 1974, Superior engaged in discussions with Mr. Byerly and Mr. Zaffran about the possibility of SCF taking over the Byerly franchise. Thereafter, Superior determined that SCF was qualified to assume the responsibilities of the Byerly franchise.

Sometime after June 30, 1974, Mr. Zaffran reviewed the contents of an unaudited income statement and an unaudited balance sheet of Byerly. Such documents provided, in part:

UNAUDITED STATEMENT OF INCOME
Nov. 1, 1973 THROUGH JUNE 30, 1974

| | |
|---|---|
| Total income ........................................... | $584,966.49 |
| Net cost of sales ..................................... | 546,795.86 |
| Gross profit ........................................... | 38,170.63 |
| Total operating expenses ........................... | 82,158.26 |
| Net income or (loss) ................................ | (43,987.63) |

UNAUDITED BALANCE SHEET
JUNE 30, 1974

*Assets*

| | | |
|---|---|---|
| Current assets ..................... | $201,679.64 | |
| Fixed assets ....................... | 82,080.97 | |
| Other assets ....................... | 4,097.40 | |
| Total assets ........................................... | | 287,858.01 |

*Liabilities and stockholders equity*

| | | |
|---|---|---|
| Current liabilities ................ | 96,797.57 | |
| Long-term liabilities ............. | 202,348.67 | |
| Total liabilities ....................................... | | 299,146.24 |

Stockholders equity

| | |
|---|---|
| Capital stock ...................... | 25,000.00 |
| Retained loss ...................... | (1,561.47) |

Previously taxed income ...... $9,260.87
Net income or (loss) ............ (43,987.63)

Total stockholders equity ........................... ($11,288.23)

Total liabilities and stockholders
equity ............................................... 287,858.01

Mr. Zaffran considered such documents and consulted with his attorney in making his decision to merge SCF with Byerly.

Prior to September 16, 1974, the ownership of SCF and Byerly was as follows:

|  | SCF | *Shares* |
| --- | --- | --- |
| Daniel E. Zaffran | | 251 |
| Mildred J. Zaffran | | 248 |
| Antoinette Hafenbrack | | 1 |

| BYERLY | |
| --- | --- |
| Howard L. Byerly | 219 |
| Wanda V. Byerly | 15 |
| John J. Kennedy | 7 |
| Sharon L. Kennedy | 7 |
| Robert C. Waters, Jr | 4 |
| Pamela J. Waters | 4 |
| Robert G. Auld, Jr | 2 |

On September 16, 1974, Daniel and Mildred Zaffran executed an agreement with the shareholders of Byerly, which provided, in part:

Byerly * * * has encountered financial difficulties in recent months and has contracted financial obligations which it and its shareholders find impossible to meet. A reorganization of the activities, operations, and locale of operations is needed and new management, expertise and financial support are indispensable for the Corporation to remain in existance and continue pursuit of its corporate purpose and goals.

Zaffran possesses experience, management capability and financial resources needed by the Corporation and is willing to undertake a relationship with the Corporation under the following terms and conditions: * * *

Under such conditions, Mr. Zaffran was to guarantee certain debts of Byerly, Byerly was to convey its real estate to Mr. Zaffran, and the shareholders of Byerly were then to sell their stock to Mr. Zaffran.

On September 16, 1974, Mr. and Mrs. Zaffran purchased all the outstanding stock of Byerly. Thereafter, on September 17, 1974, Byerly was merged into SCF and ceased to exist. The Zaffrans received 1 share of SCF for each 2 shares of Byerly.

After the merger was effected, the stockholders of SCF and their respective holdings included:

|  | Shares |
| --- | --- |
| Daniel E. Zaffran | 315.5 |
| Mildred J. Zaffran | 312.5 |
| Antoinette Hafenbrack | 1.0 |
|  | 629.0 |

In connection with their purchase of the Byerly stock, the Zaffrans executed additional agreements to hold the Byerlys harmless from certain personal debts. In addition, the Zaffrans acquired certain property from Mr. Byerly, Mr. Kennedy, and Mr. Waters, which they sold at a gain in 1975. After the merger, SCF owned all of the assets and liabilities of Byerly. Mr. Byerly became an officer and employee of SCF, and other Byerly employees were retained by SCF. On its final return covering the period November 1, 1973, to September 17, 1974, Byerly reported a loss of $70,118.

Prior to the Byerly merger, SCF was engaged in the sale of new and used school buses. Between 1969 and 1972, Jack O. Williamson was the accountant for SCF. During such years, it was the practice of SCF to provide him with a list of new and used buses on hand at the end of the year. Mr. Williamson then constructed the ending inventory by taking such list and verifying its contents through the purchase and sales journals. If an item appeared in the purchase journal which did not appear on the list, he added such item to the inventory. Conversely, if an item appeared in the sales journal, he removed such item from the inventory listing.

During 1973, SCF did not employ a full-time accountant; instead, the books and records were maintained by Mrs. Zaffran and her son. In late 1973, SCF employed Michael Hummel to prepare its Federal corporate income tax return for 1973. He did not determine the ending inventory figures for 1973. However, prior to the end of the year, he asked that a physical inventory be taken of all units. Sometime in early 1974, Mr. Hummel was presented with an inventory listing consisting of used buses. Since the list did not contain an inventory of new buses, Mr. Hummel asked the Zaffrans' son to redo the inventory. Thereafter, Mr. Hummel drew up a worksheet on which he included spaces for the entry of separate figures for the new and used bus inventories. Never-

theless, he was provided only with a single figure for the ending inventory, $175,853. SCF did not provide him with any breakdown between the new and used bus inventories. Mr. Hummel did not know how SCF arrived at such figure. The notes to his work papers read: "A physical inventory of new busses was not taken at December 31, 1973, the figure used is felt to be a close approximation by management." Since Mr. Hummel believed that the $175,853 figure represented the *total* ending inventory for 1973 (including both new and used buses), he entered such amount on the corporate return as the ending inventory for such year.

In June 1974, SCF employed George W. Durrett as its accountant. Mr. Durrett, a certified public accountant, prepared SCF"s return for 1974. To determine the 1974 ending inventory for buses and chassis, Mr. Durrett first obtained a list of the vehicles on hand. He then constructed the ending inventory from suppliers and sales invoices, since there were no summary documents listing the vehicles in transit or other items not on the premises. In late 1974, Mr. Zaffran and Mr. Byerly decided that some of SCF"s vehicular inventory had deteriorated both in appearance and in mechanical condition. Thereafter, they decided to write down the amount of such inventory and presented Mr. Durrett with a list of vehicles together with the prices as marked down. Prior to effecting such writedowns, Mr. Zaffran did not consult with Mr. Durrett, and Mr. Durrett did not participate in the writedown of such inventory. The total amount of the inventory, as written down by Mr. Zaffran and Mr. Byerly was $618,781, and that amount was included on the SCF return for 1974.

Sometime in 1976, Calvin M. Barnlund, an internal revenue agent, began an examination of SCF. On June 17, 1976, he requested that SCF provide him with its records for the 1974 beginning and ending inventory. Mr. Barnlund accepted SCF"s beginning inventory for 1974 as stated on the return, but he determined that SCF improperly wrote down its ending inventory. Mr. Barnlund then determined that the ending inventory was $698,681, and SCF agreed with such determination.

Subsequently, Mr. Durrett became concerned about the amount of profits revealed by the audit. After an investigation, he discovered some irregularities in the inventory ratios and

ultimately traced such irregularities back to the 1974 beginning inventory. Together with Robert J. Hill, the bookkeeper for SCF, Mr. Durrett reconstructed the 1974 beginning inventory by crosschecking 1974 sales invoices against 1973 purchase invoices and concluded that the cost of SCF's 1974 beginning inventory was $259,127.42.

Thereafter, on August 10, 1977, Mr. Durrett informed the IRS of his findings with respect to the 1974 beginning inventory. He took the position that he had reconstructed such beginning inventory in the same manner as Mr. Barnlund had determined the 1974 ending inventory and requested that his reconstructed 1974 beginning inventory be accepted in determining the income of SCF for 1974. After considering such request, Mr. Barnlund indicated that an adjustment to the ending 1973 inventory would be necessary. However, Mr. Durrett took the position that the statute of limitations had expired for 1973 and that nothing could be done about such year.

Mr. Durrett's reconstruction of the 1974 beginning inventory for SCF showed $71,926.64 for new bus bodies, $38,592.88 for new chassis, and $148,607.90 for used buses. For the new bus bodies and new chassis, each item of inventory was listed by an identification number, together with corresponding entries as to the factory invoice date, cost, and the place from which the inventory was acquired. Additional information was provided for the sale of each item, including the date of sale, the invoice number, and the selling price. Similarly, each item in the used bus inventory was listed according to unit number, with further information as to the date it was acquired, its cost, date of sale, sales invoice number, and selling price. Mr. Barnlund took no action to determine the validity of such figures and did not use them in computing the deficiency which he determined was owed by SCF for 1974.

On its Federal corporate income tax return for 1975, SCF claimed a net operating loss carryover from Byerly, but in this case, it now maintains that such carryover was deductible for 1974. In his notice of deficiency, the Commissioner determined that SCF was not entitled to a deduction for the net operating loss carryover of Byerly; he also revalued the 1974 ending inventory of SCF in accordance with the computation by Mr.

Barnlund, but made no change in the 1974 beginning inventory of SCF.

OPINION

The first issue for decision is whether SCF is entitled to carry over the Byerly net operating loss to its 1974 taxable year. The resolution of such issue requires us to consider certain provisions of sections 381 and 382. Section 381(a) provides, in relevant part, that:

SEC. 381(a). GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation—

\* \* \* \* \* \* \*

(2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A) \* \* \* of section 368(a)(1),

the acquiring corporation shall succeed to and take into account \* \* \* the items described in subsection (c) of the \* \* \* transferor corporation \* \* \*

Section 381(c) provides that a net operating loss carryover is one of the items referred to in section 381(a). However, section 382(b) provides, in relevant part:

(1) IN GENERAL.—If, in the case of a reorganization specified in paragraph (2) of section 381(a), the transferor corporation or the acquiring corporation—

(A) has a net operating loss which is a net operating loss carryover to the first taxable year of the acquiring corporation ending after the date of transfer, and

(B) the stockholders (immediately before the reorganization) of such corporation (hereinafter in this subsection referred to as the "loss corporation"), as the result of owning stock of the loss corporation, own (immediately after the reorganization) less than 20 percent of the fair market value of the outstanding stock of the acquiring corporation,

the total net operating loss carryover from prior taxable years of the loss corporation to the first taxable year of the acquiring corporation ending after the date of transfer shall be reduced by the percentage determined under paragraph (2).

\* \* \* \* \* \* \*

(3) EXCEPTION TO LIMITATION IN THIS SUBSECTION.—The limitation in this subsection shall not apply if the transferor corporation and the

acquiring corporation are owned substantially by the same persons in the same proportion.[2]

The Commissioner takes the position that SCF is not entitled to carry over the Byerly net operating loss because the merger of Byerly into SCF did not qualify as a reorganization within the meaning of section 368(a)(1)(A). He contends that for the merger to qualify as such a reorganization, the continuity-of-interest requirement must be satisfied, that in applying such requirement, the step-transaction doctrine must be considered, that we must apply the continuity-of-interest requirement by looking to whether there was a continuity of interest of the historic shareholders of Byerly, and that when so applied, the continuity-of-interest requirement was not satisfied. Thus, he maintains that we need not reach the question of the applicability of section 382(b) since the merger did not meet the requirements of section 368(a)(1)(A). On the other hand, SCF argues that since the Zaffrans owned all the stock of Byerly before the merger and virtually all the stock of SCF after the merger, the continuity-of-interest requirement was satisfied. In the alternative, it argues that the provisions of section 382(b) have replaced the longstanding judicial continuity-of-interest requirement and that because of the Zaffrans' ownership of Byerly and SCF, the requirement of section 382(b)(3) was satisfied.

It is well settled that for a corporate reorganization to qualify as nontaxable, there must be a continuity of proprietary interest. The regulations declare that the purpose of the tax-free reorganization provisions is:

to except from the general rule certain specifically described exchanges incident to such readjustments of corporate structures made in one of the particular ways specified in the Code, as are required by business exigencies *and which effect only a readjustment of continuing interest in property under modified corporate forms.* \* \* \* [Sec. 1.368–1(b), Income Tax Regs.; emphasis added.]

Section 1.368–2(a), Income Tax Regs., provides, in part:

---

[2]Sec. 382(b) was amended by sec. 806(e) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1599, and is effective for plans of reorganization adopted on or after Jan. 1, 1984 (sec. 111 of An Act of Dec. 29, 1981, Pub. L. 97–119, 95 Stat. 1640). As amended, the principal change was to increase the percentage of the acquiring corporation which the former stockholders of the acquired corporation must receive or retain from 20 to 40 percent.

> The term [tax-free reorganization] does not embrace the mere purchase by one corporation of the properties of another corporation, *for it imports a continuity of interest on the part of the transferor or its shareholders in the properties transferred.* * * * [Emphasis added.]

The requirement that the "historic" owners retain a continuing interest in the reorganized corporation was born of a judicial effort to confine the tax-free reorganization provisions to their proper function. *Cortland Specialty Co. v. Commissioner,* 60 F.2d 937 (2d Cir. 1937), affg. 22 B.T.A. 808 (1931); 3 B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 94.2.4 (1981). The *continuity-of-interest doctrine requires that* a certain portion of the stockholders of the transferor (acquired) corporation maintain an equity position in the transferee (acquiring) corporation after the transfer is completed and is based upon the fundamental statutory purpose of providing for the carryover of tax attributes *only* if the reorganization is distinguishable from a sale. See sec. 1.368-2(a), Income Tax Regs.; B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 3.05, at 3–19 (4th ed. 1979); *Reef Corp. v. Commissioner,* 368 F.2d 125, 132 (5th Cir. 1966), affg. on this issue a Memorandum Opinion of this Court; *Cortland Specialty Co. v. Commissioner, supra.* In testing for the continuity of shareholder interest, the courts have held that a requisite continuity is not fulfilled in the absence of a showing (1) that the transferor corporation or its shareholders retain a proprietary stake in the ongoing enterprise, and (2) that such retained interest represents a substantial part of the value of the property transferred. See generally *LeTulle v. Scofield,* 308 U.S. 415 (1940); *Pinellas Ice & Cold Storage Co. v. Commissioner,* 287 U.S. 462 (1933); *Southwest National Gas Co. v. Commissioner,* 189 F.2d 332, 334 (5th Cir. 1951), affg. 14 T.C. 81 (1950); *Kass v. Commissioner,* 60 T.C. 218 (1973), affd. without published opinion 491 F.2d 749 (3d Cir. 1974).

Moreover, it is equally well established that the incidence of taxation depends not on the form but on the actual substance of a transaction (*Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945); *Helvering v. Clifford,* 309 U.S. 331 (1940)), and "The considerations underlying the reorganization provisions were *not* cast in terms of form but of substance" (*Davant v. Commissioner,* 366 F.2d 874, 887 n. 27 (5th Cir. 1966), affg. on

this issue *South Texas Rice Warehouse Co. v. Commissioner*, 43 T.C. 540 (1965); emphasis added). The step-transaction doctrine is a particular manifestation of the more general tax law principle that purely formal distinctions cannot obscure the substance of a transaction. *Gregory v. Helvering*, 293 U.S. 465 (1935). Where the step-transaction doctrine is applied, a series of formally separate steps may be amalgamated and treated as a single transaction if they are in substance integrated, interdependent, and focused toward a particular end result. B. Bittker & J. Eustice, *supra* at par. 14.51; *King Enterprises, Inc. v. United States*, 189 Ct. Cl. 466, 474, 418 F.2d 511, 516 (1969); see L. Davis, Corporate Acquisitions and Dispositions of Businesses 4–44 (1974); S. Hagendorf, Tax Guide for Buying and Selling a Business 182–187 (5th ed. 1982). If, upon consideration of the intentions of the parties and the nature of the steps or parts of a transaction or transactions, it appears that what was accomplished should properly be treated for tax purposes as one transaction, that treatment will be established by this Court in accordance with the step-transaction doctrine. Where a step transaction is involved in a reorganization, it is necessary to look at the makeup or identity of the stockholders *before* the initial step in the series of steps and those after the final step to ascertain whether the requisite continuity of interest has been maintained by the historic shareholders. See L. Davis, *supra*.

It is clear that the merger of Byerly and SCF was effected by the Zaffrans as part of an overall plan to acquire the business of Byerly. Prior to effecting such merger, Mr. Zaffran learned of Byerly's weak financial position. He discussed with Mr. Byerly the possibility of "merging" their operations and thereafter secured the approval of Superior. In addition, Mr. Zaffran reviewed the contents of Byerly's interim financial statements and consulted with his attorney before proceeding with the plan to acquire the Byerly stock. On the day after such stock was acquired, the Zaffrans merged Byerly into SCF. A review of such record shows beyond a doubt that the ultimate objective of Mr. Zaffran was to acquire the assets of Byerly and that the purchase of the Byerly stock and its subsequent liquidation were merely steps in the accomplishment of that objective. "A given result at the end of a straight path is not made a different result because reached by

following a devious path." *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938).

The facts of the present case are very similar to those of *Estate of McWhorter v. Commissioner*, 69 T.C. 650 (1978), affd. in an unpublished opinion 590 F.2d 340 (8th Cir. 1978). In *McWhorter*, a corporation (Ozark) entered into an agreement with the shareholders of a second corporation (Benton) to purchase all of Benton's stock. Benton had a large net operating loss. Pursuant to the purchase agreement, Ozark became the sole shareholder in Benton. Eighteen days later, Ozark and Benton adopted a plan of merger, and after the merger was effected, Ozark was the surviving corporation. In disallowing Ozark's use of Benton's net operating loss, this Court wrote:

Section 381(a)(2) refers to certain A, C, D, and F reorganizations. One underlying premise of these and all reorganizations is that there is a significant, continuing proprietary interest. * * *

Petitioner clearly has not presented us with facts that indicate a continuing proprietary interest. On April 12, 1971, Ozark, which had previously owned no Benton stock, purchased all of Benton's outstanding stock. Eighteen days later, Benton was liquidated into Ozark. We cannot view the purchase and liquidation as separate, independent steps. As we noted in *Kass v. Commissioner*, 60 T.C. 218, 223 (1973), affd. per order (3d Cir., Jan. 18, 1974), "In short, where the parent's stock interest is 'old and cold,' it may contribute to continuity-of-interest. Where the parent's interest is not 'old and cold,' the sale of shares by the majority of shareholders actually detracts from continuity-of-interest." In the facts before us Ozark's interest in Benton was recently acquired. Further, there has been no showing by petitioner that the stock was not acquired as the first step in a plan to acquire Benton's assets. In view of this, we conclude the underlying continuity-of-proprietary-interest requirement necessary to some extent in every reorganization has not been satisfied. * * * As such, it is impossible for petitioner to fall within the second type of corporate combination described in section 381(a)(2). [69 T.C. at 664.]

In *McWhorter*, the corporation acquired the stock and liquidated the acquired corporation, whereas in the present case, it was the Zaffrans, the shareholders of the acquiring corporation, who acquired the stock and liquidated the acquired corporation; but in both cases, the acquisition of the stock and the liquidation were merely steps in the acquisition of the assets of the acquired corporation. Thus, the Byerly shares could hardly be considered "old and cold" in the hands of the Zaffrans for purposes of characterizing them as the

historic shareholders. *Estate of McWhorter v. Commissioner*, 69 T.C. at 664; *Yoc Heating Corp. v. Commissioner*, 61 T.C. 168 (1973); B. Bittker & J. Eustice, *supra*, par. 14.12, at 14–35, 14–36. In our view, the Zaffrans' acquisition of the Byerly shares was inextricably interwoven with their intent to effect a merger of Byerly and SCF, and since the historic shareholders of Byerly retained no proprietary interest in SCF, the requisite test of continuity was not satisfied. Accordingly, we conclude that the merger did not qualify as a reorganization under section 368(a)(1)(A), and since the carryover of tax attributes under section 381(a)(2) is conditioned on the existence of a reorganization qualifying under section 368(a)(1), we hold that SCF has not satisfied the requirement of section 381(a)(2).

There is no merit in the argument by SCF that the enactment of section 382(b) was intended to replace the continuity-of-interest requirement under sections 368(a)(1) and 381(a)(2). Section 382(b) was enacted to provide objective criteria for determining when an acquiring corporation is entitled to a carryover from a transferor corporation, and it limits such a carryover where the shareholders of the transferor corporation do not acquire at least a 20-percent interest in the acquiring corporation. *Resorts International, Inc. v. Commissioner*, 511 F.2d 107, 110 (5th Cir. 1975), affg. on this issue 60 T.C. 778 (1973). However, by its very terms, section 382(b) only applies when there has been a transfer described in section 381(a)(2); thus, the applicability of section 382(b) is not reached unless the reorganization first meets the requirements of sections 368(a)(1) and 381(a)(2). In *McWhorter*, we held that the acquiring corporation was not entitled to any carryover of a net operating loss because it failed to meet the continuity-of-interest requirement of section 368(a)(1), and the Court never reached the question of the applicability of section 382(b). Accordingly, we, too, do not reach the question of the applicability of section 382(b),[3] and we hold that SCF is not

---

[3]The Commissioner argued that in construing sec. 382(b)(3), the step-transaction doctrine should be applied and that the Zaffrans' ownership of the Byerly stock immediately before the merger should not come within the meaning of such provision. However, since we have not reached the applicability of sec. 382(b), we need not and do not pass on such argument.

entitled to carry over the Byerly net operating loss.[4]

The next issue for decision is whether the Commissioner's revaluation of SCF's 1974 ending inventory constituted a change in its accounting method. SCF does not challenge the Commissioner's revaluation of its closing 1974 inventory; but it argues that there was a mistake in determining the amount of its opening 1974 inventory and that the value of such inventory should be recomputed by use of the same method used for valuing its closing inventory. It also contends that the mistake in the opening inventory was the omission of new buses, that the correction of such a mistake is not a change of accounting method, and that therefore section 481 is not applicable. On the other hand, the Commissioner maintains that SCF has failed to prove that there was a mistake in its reported 1974 opening inventory. In the alternative, he takes the position that if the 1974 opening inventory is recomputed, there has been a change of accounting method and that an adjustment under section 481 is authorized to prevent the omission of income resulting from such change.

Section 446(a) states the general rule for methods of accounting. Such section provides that "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." However, section 446(b) provides that "If no method of accounting has been regularly used by the taxpayer, *or* if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, *does* clearly reflect income" (emphasis added). See also sec. 1.446–1, Income Tax Regs. With respect to inventories, section 471 provides:

> Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe *as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.* [Emphasis added.]

See sec. 1.471–2(a), Income Tax Regs. It is well established that

---

[4]In view of our holding, we do not need to consider the Commissioner's alternative argument that the principal purpose for the acquisition of Byerly was to avoid tax and that therefore deduction for the carryover loss is disallowed under sec. 269.

sections 446(b) and 471 vest the Commissioner with broad authority in matters of inventory accounting and give him wide latitude to recompute income so as to clearly reflect income. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532 (1979); *United States v. Catto*, 384 U.S. 102, 113–114 (1966); *Primo Pants Co. v. Commissioner*, 78 T.C. 705, 719–720 (1982).

In his regulations, the Commissioner has undertaken to define what constitutes a change in accounting method. Section 1.446–1(e)(2)(ii), Income Tax Regs., provides, in part:

(ii) (*a*) A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan. * * * A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction. Changes in method of accounting include * * * a change involving the method or basis used in the valuation of inventories * * *

(*b*) A change in method of accounting does not include correction of mathematical or posting errors, or errors in the computation of tax liability * * *

(*c*) A change in an overall plan or system of identifying or valuing items in inventory is a change in method of accounting. Also a change in the treatment of any material item used in the overall plan for identifying or valuing items in inventory is a change in method of accounting.

Where the inventory is valued according to the lower of cost or market method, the market value of each article on hand at the inventory date is compared with the cost, and the lower of the two values is the amount taken as the inventory value. Sec. 1.471–4(c), Income Tax Regs. The regulations specifically define "market" to be the "current bid price prevailing at the date of the inventory for the particular merchandise." Sec. 1.471–4(a), Income Tax Regs. Where no open market exists, or "where quotations are nominal, due to inactive market conditions, the taxpayer must use such evidence of a fair market price at the date or dates nearest the inventory as may be available, such as specific purchases or sales by the taxpayer or others in reasonable volume and made in good faith." Sec. 1.471–4(b), Income Tax Regs.

In *Thor Power Tool Co.*, the Supreme Court examined such regulations and observed:

The taxpayer must value inventory for tax purposes at cost unless the "market" is lower. "Market" is defined as "replacement cost," *and the taxpayer is permitted to depart from replacement cost only in specified*

*situations. When it makes any such departure, the taxpayer must substantiate its lower inventory valuation by providing evidence of actual offerings, actual sales, or actual contract cancellations. In the absence of objective evidence of this kind, a taxpayer's assertions as to the "market value" of its inventory are not cognizable in computing its income tax.* [439 U.S. at 535; emphasis added.]

In *Primo Pants Co. v. Commissioner, supra,* we were concerned with whether a change in the method for valuing inventory constituted a change in accounting method. In that case, a manufacturer of men's pants maintained inventories which it purported to value at the lower of cost or market. The taxpayer generally valued its finished goods at 50 percent of the sales price. Its materials and work-in-process inventories were valued at varying percentages of their costs. The taxpayer did not include any amounts for direct labor or factory overhead in valuing its inventory of manufactured goods. The Commissioner determined that the petitioner's method of valuing its inventory was improper and revalued such inventory. There, we recognized the principle that a change in the treatment of an item which affects the time for reporting income constitutes a change in an accounting method, and we pointed out that the undervaluation of inventory does affect the time for reporting income. 78 T.C. at 723–725. We concluded that since Primo had improperly valued its inventory, the Commissioner's revaluation of such inventory constituted a change in accounting method. 78 T.C. at 725; 4 B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 105.6 (1981).

When we apply the principles of these regulations and decisions to the facts of this case, it is clear that the Commissioner's revaluation of SCF's closing 1974 inventory was a change in accounting method. The record does not reveal precisely how SCF determined the items included in such inventory or the value of such items, but it is clear that SCF lacked adequate evidence to substantiate its determination of the fair market value of such items. The Commissioner, with the assistance of Mr. Durrett, identified all items to be included in such inventory and based the valuation on their cost since there was no adequate evidence that their market value was less. As SCF recognizes, such action by the Commissioner was proper, but it did represent a change in accounting method.

The facts also show that there was a mistake in the computation of the value of SCF's opening 1974 inventory, but we are not convinced that the mistake was the omission of the new buses. Mr. Hummel, who prepared the 1973 return for SCF, rejected a proposed listing of inventory which clearly omitted the new buses, and when he specifically requested a new valuation that included both new and used buses, he was given the figure of $175,853. Under such circumstances, we must conclude that SCF has failed to prove that the amount which it reported as its opening 1974 inventory omitted the new buses. Nevertheless, the evidence does show that such inventory was computed improperly on the basis of a general estimate. Compare sec. 1.471–4, Income Tax Regs. The reconstruction of the opening 1974 inventory by Mr. Durrett properly identified all new and used buses and based their valuation on cost. Such reconstruction shows that there was a substantial understatement of the opening 1974 inventory and is sufficient to establish the need for recomputing such inventory. It is well settled that the opening 1974 inventory must be computed in the same manner. as the closing inventory for that year. *Primo Pants Co. v. Commissioner*, 78 T.C. at 725; *Dearborn Gage Co. v. Commissioner*, 48 T.C. 190, 197 (1967); *Fruehauf Trailer Co. v. Commissioner*, 42 T.C. 83, 107 (1964), affd. 356 F.2d 975 (6th Cir. 1966). Accordingly, we hold that the opening 1974 inventory for SCF must be recomputed in the manner proposed by Mr. Durrett and that such recomputation constitutes a change in the method for valuing such inventory.

Since we have concluded that there was a change in the method of accounting used by SCF in 1974, it follows that section 481 is applicable. Section 481(a) provides, in relevant part:

(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted * * *

Section 481(b) provides that if an adjustment under section 481

results in a substantial increase in taxable income, the liability for the adjustment may be spread over several years.

Section 481 was designed to cure the distortions of taxable income resulting from changes in the taxpayer's method of accounting. *Grogan v. United States*, 475 F.2d 15 (5th Cir. 1973); *Graff Chevrolet Co. v. Campbell*, 343 F.2d 568, 572 (5th Cir. 1965); *Dearborn Gage Co. v. Commissioner*, *supra*. Section 481 assures that the taxpayer's income is reported correctly in the year of the change and that the distortion is taken into account in accordance with such section. The amount for the 1974 opening inventory was $83,274.42 greater than the 1973 ending inventory, and if section 481 were not applicable, that amount would be omitted from income as a result of the change in SCF's accounting method in 1974.

SCF maintains that the omission occurred in 1973, a year with respect to which the statute of limitations has run, and that therefore no adjustment can be made in 1974 with respect to such omission. Such argument was considered and rejected in *Graff Chevrolet Co. v. Campbell*, 343 F.2d at 572, where Judge Wisdom wrote:

> There is no necessary conflict between section 481 and the statute of limitations. Until the year of the accounting change, the Commissioner has no claim against the taxpayer for amounts which the taxpayer should have reported in prior years. The statute of limitations is directed toward stale claims. Section 481 deals with claims which do not even arise until the year of the accounting change. "When a taxpayer uses an accounting method which reflects an expense before it is proper to do so or which defers an item of income that should be reported currently, he has not succeeded (and does not purport to have succeeded) in permanently avoiding the reporting of any income; he has impliedly promised to report that income at a later date, when his accounting method, improper though it may be, would require it. *Section 481, therefore, does not hold the taxpayer to any income which he has any reason to believe he has avoided, and does not frustrate the policy that men should be able, after a certain time, to be confident that past wrongs are set at rest.*" Note, Problems Arising from Changes in Tax-Accounting Methods, 73 Harv. L. Rev. 1564, 1576 (1960). [Emphasis added.]

See also *W. S. Badcock Corp. v. Commissioner*, 59 T.C. 272, 288–289 (1972), revd. on another issue 491 F.2d 1226 (5th Cir. 1974).

In arguing that section 481 is not applicable, SCF also relies on *Korn Industries, Inc. v. United States*, 209 Ct. Cl. 559, 532 F.2d 1352 (1976). In *Korn*, the taxpayer, a furniture manufacturer, computed the value of its inventories by taking separate

inventories of its raw materials, work-in-process, supplies, and finished goods, based upon physical count and actual cost calculations. The cost of each piece of furniture in the finished goods inventory was computed by using the standard cost for that piece, and the standard cost consisted of the aggregate of the cost elements of materials, labor, and overhead for that piece. There were 14 kinds of materials in the finished furniture.

In the course of an internal audit of its inventories, the taxpayer discovered that its accountants had not included 3 of the 14 materials in their calculations of the finished goods inventories for a number of years. However, such elements were *not* omitted from the raw materials inventory, the work-in-process inventory, or the supplies inventory. The omissions in such years caused taxable income to be understated due to overstatements in the cost of goods sold. The taxpayer corrected the understatement of inventory and reported its beginning inventory in an amount greater than its ending inventory for the preceding year. The Commissioner audited Korn's return and determined that the adjustments constituted a change in accounting method and resulted in an omission of income necessitating an adjustment under section 481.

The Court of Claims rejected the Commissioner's position. The court took cognizance of the fact that the items omitted from the finished goods inventory were not omitted from the raw materials, work-in-process, or supplies inventories. The court found the omissions from the finished goods inventory to be inadvertent and held that the taxpayer's act of adjusting the inventory constituted the correction of a posting error within the meaning of section 1.446–1(e)(2)(ii)(*b*), Income Tax Regs.

The *Korn* case is factually distinguishable from the case now before us.[5] In *Korn*, there was an omission of certain elements

---

[5]Some commentators have pointed out that the *Korn* decision creates an exception to sec. 481 for the correction of good-faith mistakes in accounting and question the authority for such an exception. See Note, "*Korn Industries, Inc. v. United States*—Application of Section 481 to the Correction of Good Faith Accounting Error," 30 Tax Law. 175 (1976); L. Diamond & J. Holman, Accounting Methods—Definitions, Permissibility, 46–4th Tax Management Portfolio A-12 (1979). The Commissioner has also announced that he will not follow the *Korn* decision. Rev. Rul. 77–134, 1977–1 C.B. 132. Since we have concluded that *Korn* is factually distinguishable, we need not decide whether to follow such decision.

of the costs of the inventories, and the court found such omission to be inadvertent. Here, we have concluded that SCF failed to prove that there was any omission from its inventory; it was using an insupportable and improper method for valuing its inventories, and the Commissioner revalued such inventories by use of a different and proper method. Under these circumstances, we conclude and hold that within the meaning of section 481, there was a change in an accounting method used by SCF in 1974 and that as a result of such change, section 481 is applicable.

*Decision will be entered under Rule 155.*